(No. 62845.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. VERNEAL JIMERSON, Appellant.

*Opinion filed February 22, 1989.—Rehearing denied April 3, 1989.*

14

18

CALVO, J., took no part.
CLARK, J., dissenting.

Charles M. Schiedel, Deputy Defender, and Lawrence J. Essig, Appellate Defender, of Springfield, and Steven Clark, Assistant Appellate Defender, of Chicago, all of the Office of the State Appellate Defender, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Thomas V. Gainer, Jr., and Kevin Sweeney, Assistant State's Attorneys, and Marie Quinlivan Czech, Special

Assistant State's Attorney, of counsel), for the People.

JUSTICE MILLER delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, the defendant, Verneal Jimerson, was convicted of the murder of two persons. The defendant waived his right to a jury for purposes of a death penalty hearing, and the trial judge sentenced the defendant to death for the offenses. The defendant's execution was stayed pending direct review by this court. Ill. Const. 1970, art. VI, §4(b); 107 Ill. 2d Rules 603, 609(a).

The defendant's convictions and death sentence are the result of his participation in the murders of Larry Lionberg and Carol Schmal on May 11, 1978. The victims were abducted from the service station where Lionberg was employed, located in an unincorporated area of Homewood, and were taken to a vacant townhouse in East Chicago Heights. There, Carol was raped by the defendant and three other men and was shot and killed by one of the attackers. Larry was then led outside to a nearby field, where he was shot and killed.

The victims' bodies were discovered the next day, May 12. Larry was found lying face down on the ground, near a creek. The autoptic evidence established that Larry had been shot two times in the head and once in the back. The cause of his death was a bullet wound to the head, in association with a bullet wound to the heart. Carol's body was found in an upstairs room of the townhouse building; she was lying face down on the floor, and some of her clothing had been removed. Carol had been shot two times in the head at close range, and the cause of death was a bullet wound to the head.

The defendant was initially arrested in connection with these offenses in 1978. The defendant was released from custody, however, following a preliminary hearing when one of the State's witnesses, Paula Gray, recanted

her earlier statements implicating him in the crimes. Gray, who was present during the attack on the victims, was the only witness to connect the defendant to the offenses, and the preliminary hearing judge found that without her testimony there was no probable cause to hold the defendant. There was sufficient evidence, however, to hold the three other male defendants—Dennis Williams, Willie Rainge, and Kenneth Adams—and they, as well as Gray, were tried for the offenses later that year in simultaneous proceedings. Williams was convicted of murder, aggravated kidnapping, and rape and was sentenced to death for the murder convictions. Rainge was convicted of murder, aggravated kidnapping, and rape, and he was sentenced to concurrent terms of natural life imprisonment for the murder convictions and to extended terms of imprisonment for the other offenses. Adams was convicted of murder and rape and was sentenced to extended prison terms. Paula Gray was convicted of murder, rape, and perjury; she was sentenced to extended prison terms for the murder and rape convictions and to a 10-year prison term for the perjury conviction.

This court reversed Williams' convictions and death sentence and granted him a new trial because of the ineffective assistance rendered by trial counsel, Archie Weston. (*People v. Williams* (1982), 93 Ill. 2d 309.) Weston had also represented Rainge, and the appellate court, relying on the decision in *Williams*, granted Rainge a new trial; the appellate court affirmed the convictions and sentences of Adams, who had been represented by a different attorney at trial. *People v. Rainge* (1983), 112 Ill. App. 3d 396.

The appellate court affirmed Paula Gray's convictions and sentences. (*People v. Gray* (1980), 87 Ill. App. 3d 142.) Gray later filed a petition for a writ of *habeas corpus* in Federal court. The district court dismissed her pe-

tition, but the court of appeals reversed. (*United States ex rel. Gray v. Director, Department of Corrections* (7th Cir. 1983), 721 F.2d 586.) The court of appeals held that an actual conflict of interest existed between Paula and codefendant Dennis Williams and that their representation by the same attorney, Weston, had resulted in a denial of her constitutional right to the assistance of counsel. The court found that trial counsel had failed to follow any one of a variety of courses of action that an "independent, conflict-free, competent attorney" would have asserted in Paula's behalf, and that the failure to do so had been to codefendant Williams' advantage. (*Gray*, 721 F.2d at 596.) The court of appeals therefore reversed the district court's dismissal of Paula's *habeas corpus* petition and instructed the lower court to enter an order that would effect her release from custody unless the State chose to retry her.

Following the reversal of Gray's convictions in the *habeas corpus* proceeding, she agreed to testify in the State's behalf against the defendant. In December 1984 the defendant was indicted on the offenses in this case, and he was charged with four counts of murder; it appears that the defendant was not also charged with rape because prosecution for that offense was, by that time, barred by the statute of limitations. See Ill. Rev. Stat. 1977, ch. 38, par. 3—5(b).

The State presented the following evidence at the defendant's trial, which began in late October 1985. Clemente Mireles, the manager of the service station where Larry worked, testified that he arrived at the station around 6:30 a.m. on May 11, 1978, and found it unattended. The building had been ransacked, and inventory worth about $300 was missing. Mireles notified the police. Investigators from the Cook County sheriff's police department found Carol's car at the service station. Her purse, containing her driver's license and other personal

effects, was on the front seat. According to the testimony of family members, Carol and Larry were engaged to be married, and Carol, who also worked a night shift, would visit Larry at work on her holidays.

The State's principal trial witness was Paula Gray. In May 1978 Gray was 17 years old and lived with her family at 1525 Hammond Lane in East Chicago Heights. At that time she had known the defendant, Williams, Rainge, and Adams, who was her boyfriend, for one or two months. Paula testified that sometime after midnight on May 11, she and Adams were sitting in his car in front of her home. After a while Paula went inside, and Adams left. Paula testified that while she was getting ready to go to bed she heard a noise, such as that made by a car stuck in mud. Paula went outside to investigate, and she saw Williams with five other persons. Williams noticed Paula and came over and got her, pulling her to where his car was parked. There she saw the defendant, Rainge, Adams, and two white persons, a man and a woman, whom she did not know. The group entered a vacant townhouse located at 1528 Cannon Lane.

While the defendant held Larry downstairs, Williams, Rainge, and Adams led Carol upstairs. There, Williams ordered Carol to remove her clothing. Williams, Rainge, and Adams then raped Carol in succession. Rainge replaced the defendant downstairs, and the defendant then raped Carol and returned downstairs. Williams and Rainge raped Carol again. Adams did not do so, when Paula told him not to. Rainge went downstairs and the defendant came upstairs, and he raped Carol again. The defendant then went back downstairs and Rainge returned. Throughout Carol's ordeal, Paula held a disposable lighter that Williams had provided her with.

Paula testified that Williams ordered Carol to turn over, and he then shot her twice in the head. Williams,

Rainge, Adams, and Paula then went downstairs. Williams, Rainge, and the defendant took Larry outside to the banks of a creek running through a nearby field; Paula was also with them, but Adams had gone home. Williams told Larry to lie down. Using the same gun with which he had killed the woman, Williams then shot Larry in the head twice, and Rainge shot him in the back once. The defendant then left the scene. According to Paula, Williams threatened to kill her and her family if she told anyone about what had occurred.

Paula also said that she spoke to police officers following the crimes and that she testified before a grand jury. In June 1978 she testified at the defendant's preliminary hearing. Paula said that before testifying on that occasion she spoke with Archie Weston, who at that time was representing both the defendant and Rainge. Later that summer Paula was charged with murder, rape, and perjury; the perjury count was based on her testimony at the preliminary hearing. She was convicted of those charges. Paula said that her trial attorney was Weston, who was then also representing Williams and Rainge; she testified several times at her own trial, and later at Williams' sentencing hearing.

On cross-examination at the defendant's trial, defense counsel impeached Paula with portions of her testimony at the June 19, 1978, preliminary hearing, when she recanted her original statement implicating the defendant and the others in the offenses. At the preliminary hearing Paula insisted that she knew nothing about the offenses. In the main, Paula's responses on cross-examination were that she did not now recall the particular questions and answers she was being asked about.

The State also introduced evidence that Paula had provided, on an earlier occasion, an account that was consistent with her testimony at the defendant's trial. The earlier statement was presented through the testi-

mony of Patrick Pastirik, an investigator with the Cook County sheriff's police department who had interviewed Paula around 9 p.m. on Saturday, May 13, 1978, at the sheriff's police station in Homewood. Pastirik said that Paula was indicted in 1978 for murder, rape, and perjury, and that the perjury charge was based on variances in her statements.

Recounting Paula's prior consistent statement, Pastirik testified that Paula said that in the early morning hours of May 11 she was at home, sitting in a car with Kenny Adams. Later, as she was getting ready to go to bed, she heard a noise, and she saw a red Toyota stuck in the mud between two townhouses. Paula went outside and saw Williams, Rainge, Adams, and the defendant; she also saw two white persons, a man and a woman, in the back seat of the red car. Williams noticed Paula and walked over to her and grabbed her by the wrists. Williams led Paula to where the others were standing, and the group entered the townhouse at 1528 Cannon Lane.

According to Pastirik, Paula said that Larry was kept downstairs in the townhouse and Carol was taken upstairs. Williams pushed Carol to the floor and removed some of her clothing. Williams, Rainge, and the defendant raped Carol twice, and Adams raped her once. Williams then removed a gun from his trousers, turned Carol face down on the floor, put the gun to the back of her head, and shot her twice. Larry was taken outside to a field. There, Williams pushed Larry to the ground and, from a standing position, fired two shots into his head. Williams handed the gun to Rainge, who fired a shot into Larry's back. Williams then threw the gun into a nearby creek. According to Pastirik, Paula said that Williams grabbed her and threatened to kill her and her family if she said anything to the police.

Also testifying in the State's behalf was Charles Mc-Craney, a resident of the neighborhood where the mur-

ders occurred. In May 1978 McCraney lived at 1533 Hammond Lane with his wife and four children; the family had lived at that location for about two weeks before May 11. McCraney testified that he often saw the defendant, Williams, Rainge, and Adams at the Grays' residence, which was several doors away from his own, and McCraney was familiar with the cars driven by Williams, Rainge, and Adams. McCraney testified that in the early morning hours of May 11 he was practicing his guitar, and that from time to time he would go to the window to check on his car, which was parked outside. At one point that morning McCraney saw a red Toyota drive up. A yellow Vega then pulled in next to the red Toyota, and the two drivers talked. The red car's driver, whom McCraney identified as Dennis Williams, got out of his car and threw a rock at a street light, breaking the bulb. The driver of the Vega, whom McCraney identified as Willie Rainge, then got in Williams' car, and they drove off.

Sometime later, around 3 or 3:15 a.m., McCraney heard the sound of a car stuck in mud. McCraney's building, on Hammond Lane, was separated by a courtyard from the building behind it, which was on Cannon Lane. Williams' car was stalled in the courtyard, and from his upstairs windows McCraney was able to see three or four persons exit from a beige Toyota, which McCraney identified as belonging to Adams, and run from the street to the courtyard area, where they helped free Williams' car. They pushed the car to a position in front of the doorway of the townhouse at 1528 Cannon Lane, and six to eight persons then rushed into the building. About an hour later, McCraney heard the sound of a gunshot.

McCraney testified that he had not been able to see whether the defendant was among the group that entered the townhouse on Cannon Lane, or whether any of

those persons were white. McCraney testified that he had seen the defendant in the neighborhood earlier that night, between 10 p.m. and midnight. McCraney said that later that morning, on May 11, he saw Williams stop his car by the street light on Hammond Lane and clear away the broken glass. Williams then entered the Grays' residence.

The next morning, Friday, May 12, McCraney learned that a body had been found in a nearby field. The authorities were notified, and a crowd gathered. McCraney saw Williams in the group, joking with others. Later, the second body was discovered in the townhouse at 1528 Cannon Lane, and McCraney recalled that he had seen Williams' car next to that building. McCraney called the Cook County sheriff's police department, reporting that "the people" responsible for the homicides were present in the crowd and providing descriptions of the red and beige Toyotas he had seen the previous day.

David Capelli, an investigator with the Cook County sheriff's police department, was summoned to the crime scene on Friday, May 12, following the discovery of Larry's body. Around one o'clock that afternoon Capelli received a radio dispatch relating the substance of McCraney's tip. As the officers moved toward the group of onlookers, Capelli noticed two black males break from the crowd and walk briskly away. Capelli and his partner followed the two men, who looked over their shoulders at the officers and speeded up; they were walking toward a red Toyota. The officers caught up with the two men at the car. One of the men, whom Capelli identified as Dennis Williams, was standing on the driver's side and had a set of keys in his hand; the other man, whom Capelli identified as the defendant, was on the passenger's side. The defendant told the officers that he had gone to the car to retrieve his sunglasses. The defendant and Williams were placed under arrest.

In addition to the autoptic evidence, which we have already summarized, the State introduced at trial the results of certain scientific tests performed on physical evidence in this case. Bullets recovered from the bodies of the victims were examined by Walter Sherk, a firearm evidence specialist with the Illinois Department of State Police. Sherk testified that the bullets had been fired from the same gun. Sherk based that conclusion on a comparison of the bullets' rifling characteristics and striations, or scratches. Rifling characteristics and striations, Sherk explained, are imparted to a projectile as it passes through a gun barrel.

Dennis Williams' car was processed for evidence on Sunday, May 14, 1978. Michael Podlecki, a specialist in forensic serology and microtomy with the Illinois Department of State Police, compared hairs found in the interior of the car with head hair standards of the victims. Podlecki testified that a hair found in the back seat of the car was consistent with Larry's hair, and that hairs found in the trunk and rear floorboard of the car were consistent with Carol's hair. Podlecki also examined oral, vaginal, and rectal swabs taken of Carol at the time of the autopsy. Seminal fluid was found on the vaginal smear, and it was tested for the presence of certain antigens, indicators of blood type secreted by 80% of the population in their bodily fluids. Both blood types A and O were present. Podlecki said that the victim had type O blood but that it could not be determined whether she was a secretor. Tests on the saliva and blood of the defendant, Williams, Rainge, and Adams established that all four were secretors, that Williams and Adams had type A blood, and that the defendant and Rainge had type O blood. Podlecki concluded that the defendant could not be eliminated as a source of the semen. According to the testimony, type O blood is found in 47% of the population.

At trial the defendant presented an alibi defense. The defendant testified that in May 1978 he and his family lived on the north side of Chicago and that he was employed at a car wash in Park Forest South. The defendant said that he did not own a car. The defendant knew Williams and Adams and, less well, Rainge. The defendant also knew the Grays, but he said that he never socialized at their home. The defendant testified that on May 10, 1978, he left work between 6:45 and 7 p.m. and got a ride to East Chicago Heights with his brother-in-law. He went to the home of James and Vanessa Jones; the defendant was married to Vanessa Jones' sister. The house was a block away from Hammond Lane. Jones was unable to drive the defendant and his family home, so the defendant then asked Dennis Williams for a ride; Williams lived across the street from the Joneses. The defendant testified that he had known Williams for several years but that they did not socialize, and that he had not previously asked Williams for a ride. Williams agreed to do it, and they left between 8:30 and 8:45 that evening. The defendant testified that Williams stayed at the defendant's apartment in Chicago for about an hour.

The defendant testified that on Friday morning, May 12, he went to work at the car wash. Following a power failure, the manager permitted the employees to leave. The defendant said that he went to his brother's house in East Chicago Heights, and while he was there he heard that bodies had been discovered in the Cannon Lane neighborhood. The defendant went to the scene, where he saw Dennis Williams. The defendant asked Williams whether he could get his sunglasses from Williams' car. Williams gave the keys to the defendant, who then "trotted" over to the car, opened it, and got his sunglasses. According to the defendant, a law enforcement officer then asked the defendant whose car it was,

and the defendant called Williams over. The defendant said that he and Williams were then arrested.

The defendant testified that after his arrest he was taken to the Cook County sheriff's police station in Homewood, where he was questioned and eventually released. The defendant said that he returned to the police station early the next morning, when investigators called him at a relative's home in East Chicago Heights and asked him to come in for further questioning. There he saw Paula Gray talking to an investigator. The defendant testified that the door to the interview room was closed but that he was able to overhear Paula tell the officers that he had not been present during the commission of the crimes. According to the defendant, the officers then told Paula about a $2,500 reward, and Paula responded, " 'Yes, he were [sic] there ... if I am going to get the reward.' "

The defendant testified that he was originally charged with these offenses in 1978, that later he was released from custody, and that he was reindicted for the same offenses in December 1984. The defendant stated that he lived in East Chicago Heights from 1979 until 1984. The defendant insisted that he was at his home in Chicago when the offenses were committed. He denied having any part in the commission of the crimes, and he denied that he was with Williams, Rainge, and Adams late in the evening of May 10 and early in the morning of May 11.

The defendant's wife, Nezzie Jimerson, and his sister-in-law, Vanessa Jones, corroborated various parts of the defendant's testimony. Mrs. Jimerson testified that in May 1978 she, the defendant, and their three children had been living on the north side of Chicago. Mrs. Jimerson said that around 8 or 9 o'clock during the evening of May 10, 1978, she and her family were at the home of her sister, Vanessa Jones, in East Chicago Heights. Ac-

cording to Mrs. Jimerson, Dennis Williams gave the family a ride to Chicago later that evening, and they arrived home around 9:30 or 10. Williams stayed there for about half an hour, and she believed that he left before midnight. Mrs. Jimerson testified that the defendant remained at home until he left for work the next morning. Mrs. Jimerson said that the family did not own a car at that time and that one of their neighbors frequently had given them rides to the East Chicago Heights area.

Also testifying in the defendant's behalf was Vanessa Jones, sister of defendant's wife. Mrs. Jones testified that on May 10, 1978, the defendant and his family were at her home. According to Mrs. Jones, her husband was unable to drive the Jimersons to Chicago, and later that evening Dennis Williams gave the family a ride home.

The jury returned verdicts finding the defendant guilty of the murders of Larry Lionberg and Carol Schmal. The State then requested a hearing for purposes of determining whether the defendant should be sentenced to death. The defendant waived his right to a jury, and the hearing was conducted before the trial judge on December 9, 1985. The parties stipulated that the testimony of the trial witnesses would be the same if called to testify at the sentencing hearing. The parties also stipulated that the defendant was 18 years or older at the time of the offenses. The trial judge found that the defendant was eligible for the death penalty under the multiple-murder aggravating circumstance, section 9—1(b)(3) of the Criminal Code of 1961 (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(b)(3)).

At the second stage of the sentencing hearing, the parties again stipulated that the trial witnesses would provide the same testimony if called to testify. The State did not present any further aggravating evidence. The defendant then presented a witness in mitigation, the Reverend Charles Nelson, pastor of a church located in

East Chicago Heights. Pastor Nelson testified that he had known the defendant and his family for about 20 years, and he said that the defendant had done maintenance work at the church, without charge. Pastor Nelson said that he found the defendant to be reliable and trustworthy. No further evidence in mitigation was presented. Allowed an opportunity for allocution after the parties' arguments, the defendant declared that he was innocent of the offenses and asserted that the trial jury had been prejudiced against him. The trial judge ruled that there were no mitigating circumstances sufficient to preclude imposition of the death penalty and sentenced the defendant to death.

The defendant first contends that his trial counsel was incompetent for failing to impeach Paula Gray more extensively and for failing to offer her prior inconsistent testimony as substantive evidence, as counsel could have done under section 115—10.1 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1985, ch. 38, par. 115—10.1). The defendant makes similar contentions with respect to Charles McCraney's testimony, asserting that counsel should have impeached McCraney with several inconsistent statements, and that he should also have used them substantively.

We consider first Paula Gray's testimony. On four earlier occasions Paula had given testimony inconsistent with the testimony she gave at the defendant's trial. Those proceedings in which Paula made inconsistent statements were a preliminary hearing, held in June 1978; a hearing on the motion to suppress her inculpatory statements, in October 1978; her own trial, also in October 1978; and the capital sentencing hearing of codefendants Williams and Rainge, in January 1979. On each of those occasions Paula testified that she knew nothing about the offenses in this case. She denied having any part in the commission of the crimes, denied

having any knowledge about the involvement of Williams, Rainge, Adams, and the defendant, and asserted that she and the four others were innocent. She also declared that her original statements inculpating herself and the others were "lies" that the authorities had concocted and forced her to tell. At the defendant's trial, defense counsel attempted to impeach Paula only with material from the June 1978 preliminary hearing. On cross-examination, Paula replied that she did not remember a number of statements she made at the preliminary hearing, including the statements that she had not seen any white persons on May 11, that the police had made her tell a lie, that her testimony to the grand jury in May 1978 was a lie, that she did not hear a noise after Adams left, and that she did not know anything.

The applicable standard governing our assessment of counsel's performance is set out in *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052; see *People v. Albanese* (1984), 104 Ill. 2d 504, 526-27 (adopting the *Strickland* standard for use in Illinois). In *Strickland* the Court explained:

> "A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." (*Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064.)

With respect to the performance prong of the *Strickland* test, it must be noted that in matters of trial strategy, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-91, 80 L. Ed. 2d at 695, 104 S. Ct. at 2066.

In this case, defense counsel was aware that Paula had testified at a number of earlier proceedings in a manner inconsistent with her testimony in the present trial. Nonetheless, counsel chose to attempt to impeach Paula only with her testimony from the June 1978 preliminary hearing. On cross-examination, Paula replied that she could not remember making those statements. Counsel did not make any further efforts to impeach the witness, nor did counsel introduce further evidence showing that the statements had in fact been made.

The value of the potentially impeaching material must be placed in perspective. In her earlier, inconsistent testimony Paula did not exculpate the defendant while inculpating others. At no time in the four earlier proceedings did Paula declare that the defendant was innocent while others were guilty, or even indicate that she knew anything about the offenses. Rather, in her earlier testimony Paula simply maintained that she knew nothing about the offenses in this case, that she, Williams, Rainge, Adams, and the defendant in this case were innocent, and that her original statements inculpating both herself and the four others were "lies." Efforts to impeach Paula with the full range of her prior testimony could well have invited the jury to conclude that her testimony in this case was believable precisely because of the unbelievable character of her earlier assertions that

she knew nothing about the crimes and that she, Williams, Rainge, Adams, and the defendant in this case were all innocent of the charges. Not only had Paula, Williams, Rainge, and Adams been convicted, but there was no explanation of how Paula could know that the others were innocent if she herself knew nothing about the offenses. Counsel could well have concluded that further attempts to impeach Paula would not have added significantly to whatever damage had already been done to the State's case.

Similarly, we do not believe that counsel was deficient for failing to make substantive use of any of Paula's prior inconsistent statements, as counsel could have done under section 115—10.1 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1985, ch. 38, par. 115—10.1). Paula's prior assertions that she knew nothing about the crimes and that she, Williams, Rainge, Adams, and the defendant in this case were innocent of the offenses would not have provided any greater benefit to the defendant as substantive evidence than as impeachment.

To prevail on a claim alleging ineffective assistance of counsel, a defendant must establish that he was prejudiced as a result of counsel's errors. Assuming that trial counsel was deficient for failing to impeach Paula Gray more fully and to offer her prior inconsistent testimony as substantive evidence, we do not believe that the defendant was prejudiced. With respect to the prejudice prong of the ineffective-assistance standard, the court in *Strickland* said:

> "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.)

Counsel's performance in this case does not undermine our confidence in the outcome of the trial. As we have indicated, the impeachment and substantive value of Paula's inconsistent testimony was not great. Her prior statements exculpating herself, the defendant in this case, and Williams, Rainge, and Adams had been rejected by the jury in her own case, and apparently by the sentencing jury in the case of Williams and Rainge. Moreover, as we shall discuss later, the physical and forensic evidence and the testimony of Charles McCraney corroborated much of Paula's testimony at the defendant's trial, and therefore contradicted her earlier inconsistent statements. On the record before us, we are unable to conclude that the defendant was prejudiced as a result of counsel's conduct.

The defendant makes the related contention that counsel was ineffective for failing to introduce evidence of Paula's earlier claims regarding police coercion. In her earlier testimony, she had said that the authorities hit her, threatened her, and made her tell lies. Again, defense counsel could simply have believed that an attempt to obtain a recitation of the witness' prior testimony in that regard would not have been worth the inquiry, opening the door to extensive police testimony regarding their treatment of Paula and the circumstances of her arrest, including her mother's advice to her to tell the truth.

The defendant also argues that trial counsel was ineffective for failing to impeach Charles McCraney with several inconsistent statements he had made in an earlier trial arising from these offenses, and for failing to offer the earlier testimony as substantive evidence here.

At the defendant's trial, McCraney testified that he saw the defendant with Rainge and several others in the neighborhood sometime between 10 p.m. and midnight

on May 10. The defendant claims that McCraney testified during the September 1978 trial of Williams, Rainge, and Adams that he did not see the defendant at anytime on the night of May 10-11. Asked on cross-examination at the earlier trial whether he saw "anyone other than these three defendants sitting in front of [his] house," McCraney replied, "To be able to recognize them, no, but there were other people there." It is not at all clear from the testimony, however, what time period is being discussed. Earlier, the cross-examiner had inquired specifically about the period around 2:30 and 2:45. We do not interpret the testimony as indicating that McCraney did not see the defendant in the vicinity on May 10.

As we have indicated, McCraney testified at the defendant's trial that the defendant was in the neighborhood with Rainge and several other persons on May 10, before midnight. The defendant points out that at the September 1978 trial McCraney testified that he had seen Rainge's car in the area that night but that he did not see Rainge until around 2:30 or 2:45 on the morning of May 11. We do not view that as a material inconsistency. The defendant's presence in the neighborhood, and not Rainge's, was significant at this trial.

At the defendant's trial McCraney testified that he saw six to eight persons enter the Cannon Lane townhouse and that he had not been able to see whether the defendant was among the group. The defendant argues that McCraney gave contradictory testimony at the September 1978 trial. On that occasion McCraney stated that he knew, by sight, three of the six to eight persons who entered the townhouse, and he identified the three he recognized as the defendants in that case—Williams, Rainge, and Adams. We find no inconsistency in the testimony. McCraney was not also asked at the earlier proceeding whether he was able to identify any persons,

other than the defendants at that trial, among those who entered the townhouse, and therefore his failure to state on that occasion that he could not tell whether this defendant was among the group is not meaningful.

McCraney testified in this case that he established the time of several of the events on the basis of two clocks in his home. At the September 1978 trial, however, Mc-Craney gave testimony indicating that he did not have any clocks. Asked whether he next saw Williams, Rainge, and Adams "about 2:47 or so? Two to three minutes you said. 2:50?" McCraney replied, "We didn't have a clock. That's close."

Although there is a variance in the testimony, we do not believe that it is a significant one. Having examined the prior inconsistent statements raised by the defendant, we conclude that trial counsel was not ineffective for failing either to impeach McCraney with the earlier inconsistent statements or to offer the earlier testimony as substantive evidence in this case.

The defendant next argues that he was denied a fair trial by the State's presentation, through testimony and argument, of certain information regarding the personal traits and characteristics of the two murder victims. Relying primarily on *People v. Hope* (1986), 116 Ill. 2d 265, the defendant contends that the information was irrelevant and inadmissible but was presented by the prosecution as material evidence in the case.

The portions of the trial argument and testimony challenged by the defendant are set out below, in full. The defendant first complains of a comment made by the prosecutor in his opening statement. The prosecutor said:

"On May 11, 1978, a young couple who resided in the south suburbs was engaged to be married. Their names were Larry Lionberg and Carol Schmal. They were both hard-working individuals."

Later, in questioning Larry Lionberg's father, a life and death witness, the following colloquy occurred:

"Q. Mr. Lionberg, are you married?
A. Yes.

* * *

Q. Do you know a girl by the name of Carol Schmal?
A. Yes, I did.
Q. What was her relationship, if any, between your son and Carol?
A. That was his girlfriend, and they were making plans, which was kind of secret at first, to get married the next month.

* * *

Q. Mr. Lionberg, before May 11th of 1978, when was the last time prior to that time that you had seen your son?
A. I saw him on his birthday, which was the 16th.
Q. On April 16th, when you saw him on his birthday, was he alive and well?
A. He was.
Q. After May 11th of 1978, where was the next time that you saw your son?
A. I saw him at the morgue.

* * *

Q. Mr. Lionberg, I have to show [you] what has been marked previously People's Exhibit No. 1 for identification. Would you look at that photograph, sir?
A. Yes.
Q. Do you recognize the people who are depicted in that photograph?
A. That is Larry and Carol, that is his birthday, we had a little party at my daughter's house."

The defendant believes that similarly inadmissible evidence was presented during the prosecutor's questioning of another "life and death" witness, Lynn Fisher, who was Carol Schmal's sister:

"Q. Ma'am, directing your attention to May of 1978, did you know a young lady by the name of Carol Schmal?
A. Yes.

Q. And how did you know her?

A. My sister.

Q. Was she your older or younger sister?

A. My younger sister.

\* \* \*

Q. Now, in May of 1978, ma'am, did you know a fellow by the name of Larry Lionberg?

A. Yes.

Q. And for how long had you known Larry?

A. Six months.

Q. And what was the relationship between Larry and Carol?

A. My sister and Larry had recently been engaged to get married, so he was going to be part of our family.

\* \* \*

Q. \*\*\* I now show you what has been marked People's Exhibit No. 1 for identification, do you recognize who is depicted in that photograph?

A. Yes.

Q. Who are those people

A. My sister and Larry. It was Larry's birthday party or gathering.

\* \* \*

Q. When was the last time before May 11th of 1978 that you saw your sister?

A. I would see her regularly, so it was a matter of a couple of days. She had helped me a little bit, organized my little boy's birthday party which was May 11th. So I was waiting for her to show up, as a matter of fact, with some things for my boy['s] birthday party. I saw her regularly every couple of days at least.

Q. Did she show up on your son's birthday, May 11th?

A. No, it was so strange, she is my boy's godmother, why wasn't she at his little party; it was really strange.

\* \* \*

Q. After May 11th of 1978, when was the next time you saw Carol?

A. On Mother's Day when she was waked."

The defendant also complains of testimony elicited by the prosecutor from an investigating officer regarding the acquisition of the identifying photograph of Larry and Carol:

"Q. Did you go over [to] that residence at 348 Arquella Drive?

A. Myself and my partner did go to that residence.

Q. And did you talk to anyone there?

A. We talked to a Mr. George Schmal. We asked him if he was, in fact, related to a Carol Schmal. He said yes, that was his daughter ***.

Q. And as a result of that conversation, did you receive anything from him?

A. Yes, we did.

Q. What was that?

A. It was a picture of Carol Schmal and Larry Lionberg together, taken at a party."

Finally, the defendant complains of certain comments made by the prosecutor in closing argument and in rebuttal argument. The prosecutor said, in closing:

"The evidence in this case, ladies and gentlemen, showed you that in early May, 1978, the young couple portrayed in People's Exhibit No. 1, received now in evidence, is a couple by the name of Larry Lionberg and Carol Schmal. The evidence showed that [in] early May of 1978, they were planning to be married, that Carol was working at the Tinley Park Mental Health Center, was working nights."

In rebuttal argument, the prosecutor said:

"Can you imagine a young couple, about to be married, being brought by the point of a gun, the man to be staying downstairs, the girl to be going upstairs. You have just been the subject of an armed robbery."

The defendant notes further that the identifying photograph of the murder victims was sent to the jury room after the close of evidence when the jury began its deliberations.

This court has previously condemned prosecutorial efforts to present otherwise irrelevant information about a crime victim's personal traits or familial relationships as material evidence in a criminal case. (See *People v. Hope* (1986), 116 Ill. 2d 265; *People v. Bernette* (1964), 30 Ill. 2d 359; *People v. Dukes* (1957), 12 Ill. 2d 334.) In *Hope* the prosecutor made repeated references, in the guilt phase of a capital trial, to evidence that the murder victim was survived by a wife and three young children. At trial, the victim's widow was asked specifically about the composition of the family on the day her husband was killed. Moreover, the "life and death" photograph used in that case depicted the murder victim with his wife and two of their children; the presence of the wife and children in the picture was the subject of a question by the prosecutor to the widow, and their presence was also remarked on by another witness who was asked to describe the photograph. Over the defendant's objection, the same photograph went to the jury room at the close of evidence. Discussing the prejudicial effect of the evidence, we stated:

> "The evidence concerning the decedent's family was not brought to the jury's attention *incidentally*, rather it was presented in a series of statements and questions in such a method as to permit the jury to believe it material. (*People v. Bernette* (1964), 30 Ill. 2d 359, 371.) If any doubt existed as to its materiality, it was removed when defense counsel's objections were overruled. In overruling the objections the prejudicial effect was amplified. See *People v. Faysom* (1985), 131 Ill. App. 3d 517, 522." (Emphasis in original.) *Hope*, 116 Ill. 2d at 278.

The instant case is different from *Hope* in several important respects. Here, defense counsel made no objection at trial to any of the argument or evidence now complained of. Thus, unlike *Hope*, in this case there was no suggestion to the jury, through an adverse ruling on a

defense objection to the evidence or argument, that the information was in fact a legitimate consideration in the determination of the defendant's guilt or innocence. Also, defense counsel did not raise any objection in the defendant's post-trial motion. Thus, trial counsel's procedural defaults have failed to preserve for purposes of review any objections to the argument or testimony. And contrary to the defendant's claim here, we do not believe that the presentation of the information was plain error and therefore a matter cognizable on appeal notwithstanding the lack of any contemporaneous objection. (See 107 Ill. 2d R. 615(a).) At oral argument in this case, the defendant made the further contention that trial counsel was ineffective for failing to preserve the issue for review. The defendant did not see fit to include that additional argument in the briefs he filed in this court, however, and therefore it has been waived. See *Village of Crainville v. Argonaut Insurance Co.* (1980), 81 Ill. 2d 399, 405; 107 Ill. 2d Rules 341(e)(7), 612(i).

The great bulk of the information now complained of either was relevant and admissible, or else was elicited from the witnesses in an incidental, nonprejudicial manner. The testimony that the victims were engaged to be married was relevant, providing a reason for their presence together at the service station in Homewood early in the morning before their abduction. The photograph of the victims together at Larry's recent birthday party was the one that Carol's father had given to investigating officers at the beginning of the extensive search for the missing couple. The testimony regarding Carol's absence from her nephew's birthday party on the date of their disappearance, May 11, was relevant, for it tended to show that the abduction occurred before that time. Mrs. Fisher's reference to Mother's Day in her testimony relating the next time she saw her sister was an incidental remark. Finally, the prosecutor's comment

that the victims were hardworking, though perhaps unnecessary, was not so prejudicial that the defendant can be deemed to have been denied a fair trial.

From our review of the record in this case, we conclude that much of the information now complained of was relevant and admissible. The remaining portions were elicited only incidentally, or else were volunteered by the witnesses. In any event, the material was presented only sporadically in the course of six days of argument and testimony. We do not discern here a calculated effort by the prosecution to present the information as material evidence bearing on the defendant's guilt or innocence. See *People v. Free* (1983), 94 Ill. 2d 378, 413-15.

The defendant next argues that he was not proved guilty of the victims' murders beyond a reasonable doubt. In support of this contention the defendant notes that the only direct evidence of his guilt came from an accomplice witness, Paula Gray. The defendant asserts that there was no meaningful corroboration of Paula's testimony, and he maintains that his alibi evidence provided a credible account of his whereabouts at the time of the offenses.

A criminal conviction will not be set aside on review unless the evidence is so improbable or unsatisfactory that there remains a reasonable doubt of the defendant's guilt. (*People v. Collins* (1985), 106 Ill. 2d 237, 261; *People v. Williams* (1982), 93 Ill. 2d 309, 315; *People v. Vriner* (1978), 74 Ill. 2d 329, 342.) It is not our function to retry a defendant when considering a challenge to the sufficiency of the evidence of his guilt. (*Collins*, 106 Ill. 2d at 261.) Rather, determinations of the credibility of witnesses, the weight to be given to their testimony, and the reasonable inferences to be drawn from the evidence are responsibilities of the trier of fact. (*People v. Brisbon* (1985), 106 Ill. 2d 342, 360.) On review, " 'the relevant

question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' \*\*\* '[O]nce a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution.' (Emphasis in original.)" *Collins*, 106 Ill. 2d at 261, quoting *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789.

Applying those principles to the case before us, we conclude that there was sufficient evidence to support the defendant's convictions. Although the testimony of an accomplice is to be viewed with suspicion (*People v. Sanchez* (1986), 115 Ill. 2d 238, 261; *People v. Baynes* (1981), 88 Ill. 2d 225, 232), it may be sufficient, even in the absence of corroboration, to sustain a conviction (*People v. Wilson* (1977), 66 Ill. 2d 346, 349). In this case, Paula Gray provided a detailed account of the murders and of her own role in the commission of the crimes. Moreover, Paula's trial testimony found corroboration in the narrative, in evidence here, that she gave the authorities shortly after the murders occurred. As a prior consistent statement, her earlier account of the crimes tended to rebut the inferences, suggested by the defense, that Paula had a motive to testify falsely in this case and that her testimony here was a recent fabrication. (See *People v. Shum* (1987), 117 Ill. 2d 317, 340-41; *People v. Emerson* (1983), 97 Ill. 2d 487, 500-01.) The jury was made aware of the frailties of her testimony. Receiving the standard instruction on accomplice testimony, the jurors were told, "When a witness says [she] was involved in the commission of a crime with the defendant, the testimony of that witness is subject to

suspicion and should be considered by you with caution. It should be carefully examined in light of the other evidence in the case." (See Illinois Pattern Jury Instructions, Criminal, No. 3.17 (2d ed. 1981).) Finally, the jury was also aware, through the attempted impeachment, of a significant number of Paula's prior inconsistent statements, in which she had denied having any knowledge about the offenses.

Although the State was not able to provide independent corroboration of Paula's identification of the defendant as a participant in the offenses, the State was able to corroborate many other important aspects of her testimony. The victims' bodies were discovered where Paula said they had been killed. Charles McCraney, in his testimony, described the activity around the vacant townhouse where Carol's body was later discovered. McCraney's testimony provided confirmation of Paula's account of the time and location of Carol's murder, and her identification of Williams and Rainge as two of the offenders. Moreover, scientific evidence established that the shots that killed the victims had been fired from the same weapon, as Paula testified. Other forensic testimony further supported Paula's account. Hairs consistent with the victims' hair were found in Williams' car, and antigens indicative of the four male offenders' blood types were present in the vaginal smear of the rape victim. Finally, the defendant's conduct at the crime scene on Friday, May 12, following the discovery of the victims' bodies was an additional circumstance corroborating Paula Gray's inculpatory testimony. The investigating officer's description tended to show that the defendant chose to depart the area when law enforcement officers began their sweep through the crowd. Evidence of flight may be a circumstance tending to show consciousness of guilt. *People v. Terrell* (1984), 99 Ill. 2d 427, 433; *People v. Harris* (1972), 52 Ill. 2d 558, 561.

The jury was entitled, of course, to credit Paula's testimony and to disregard the defendant's alibi evidence, even though the alibi was supported by the greater number of witnesses. (See *People v. Berland* (1978), 74 Ill. 2d 286, 307; *People v. Jackson* (1973), 54 Ill. 2d 143, 149; *People v. Catlett* (1971), 48 Ill. 2d 56, 64.) Also, the defendant's alibi was contradicted in part by Charles McCraney, who testified that he saw the defendant in the vicinity of the Grays' residence on May 10 sometime between 10 p.m. and midnight, which, according to the defendant's evidence, was after he and his family had already left East Chicago Heights for the return trip to their Chicago home.

In sum, we conclude that the evidence in this case is sufficient to sustain the defendant's convictions, and they are affirmed. The defendant raises no further challenges to his convictions or the trial proceedings, and we now turn to the questions raised by the defendant concerning his death sentence and the sentencing hearing.

The defendant raises a number of contentions concerning his death sentence. First, he makes two related claims: that trial counsel rendered ineffective assistance at the initial stage of the penalty hearing by failing to present and argue evidence that would have negated the requisite mental state for eligibility under the multiple-murder aggravating circumstance. Second, the defendant contends that the evidence actually presented in this case failed to establish the requisite mental state.

The defendant's eligibility for the death penalty was based on the multiple-murder aggravating circumstance, found in section 9—1(b)(3) of the Criminal Code of 1961. (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(b)(3).) At both the time of the commission of the offenses and the time of the defendant's trial, the statute provided:

"[T]he defendant has been convicted of murdering two or more individuals under subsection (a) of this Section or

under any law of the United States or of any state which is substantially similar to Subsection (a) of this Section regardless of whether the deaths occurred as the result of the same act or of several related or unrelated acts so long as the deaths were the result of either an intent to kill more than one person or of separate premeditated acts." (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(b)(3).)

The provision has since been amended by the deletion of the phrase "separate premeditated acts" and the substitution of the words "separate acts which the defendant knew would cause death or create a strong probability of death or great bodily harm to the murdered individual or another." See Ill. Rev. Stat. 1987, ch. 38, par. 9—1(b)(3).

The defendant appears to interpret the multiple-murder circumstance as requiring proof of the intentional or knowing commission of the murders. He relies on *People v. Davis* (1983), 95 Ill. 2d 1, in support of that theory. We do not construe *Davis* as limiting the mental states allowable under the provision to intent or knowledge. We believe that under certain circumstances less culpable mental states, such as reckless indifference, may suffice.

In *Davis* the court construed the language in section 9—1(b)(3) concerning premeditation. Inquiring into the legislative history of the provision, the court stated that:

"[The language was designed] to insure that a defendant would not suffer the death penalty where a multiple murder is an accidental consequence of a single act. In other words, the physical act leading to a multiple murder must be accompanied by a culpable mental state as to *each* murder. A defendant may not receive the death penalty for related, multiple murders where more than one person was accidentally killed. Thus, the intent of the amendment was to address the problem of multiple murders committed at the same time.

In the instant case, defendant did not receive the death penalty because of his participation in a multiple-murder situation. He was convicted of three separate and unrelated murders. In the Cash murder case, he was con-

victed after the jury had been instructed solely on an intent-to-kill theory. In the Oertel case, the jury was instructed to find defendant guilty if he (or a person for whom he was responsible) intended to kill or do great bodily harm, or knew his act would cause death or great bodily harm. In the case at bar, the jury was instructed as to each murder theory, and it is therefore unclear upon which theory they found defendant guilty. We hold in this case that where, as here, defendant is convicted of two or more murders resulting from intentional *or* knowing acts, the death penalty may properly be imposed." (Emphasis in original.) (*Davis*, 95 Ill. 2d at 35-36.)

As *Davis* also noted, some culpable mental state is necessary. But *Davis* did not consider whether mental states different from intent or knowledge would also satisfy the multiple-murder aggravating circumstance, and we decline to interpret the opinion as limiting application of section 9—1(b)(3) to the mental states of intent and knowledge.

A certain degree of culpable conduct is necessary, under the Federal Constitution, to warrant imposition of the death penalty. In *Enmund v. Florida* (1982), 458 U.S. 782, 73 L. Ed. 2d 1140, 102 S. Ct. 3368, the Court ruled that the death penalty could not be imposed on a defendant who was guilty of two felony murders as an accomplice and who "does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed." (*Enmund*, 458 U.S. at 797, 73 L. Ed. 2d at 1151, 102 S. Ct. at 3376.) The defendant in *Enmund* was the driver of a getaway car; his codefendants had gone to a house to commit an armed robbery, and they shot and killed the victims after being fired on by one of the residents. *Enmund*'s requirement did not create a new element of capital murder. Rather, it is a principle of proportionality, barring imposition of the death penalty on the class of murderers who fall within

its scope. *Cabana v. Bullock* (1986), 474 U.S. 376, 385, 88 L. Ed. 2d 704, 716, 106 S. Ct. 689, 696.

In *Tison v. Arizona* (1987), 481 U.S. 137, 95 L. Ed. 2d 127, 107 S. Ct. 1676, the Supreme Court considered whether *Enmund* precluded imposition of the death penalty on defendants who had been convicted of the murder of four persons under an accountability theory. The petitioners in that case had taken part in an armed prison escape with two other persons. When their own vehicle became disabled, the group flagged down a passing car, which contained a family of four. Later, while the *Tison* petitioners were occupied nearby, their codefendants shot and killed the car's occupants. In holding that the petitioners could be sentenced to death for their conduct, the Court held that "the reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death represents a highly culpable mental state, a mental state that may be taken into account in making a capital sentencing judgment when that conduct causes its natural, though also not inevitable, lethal result." (*Tison*, 481 U.S. at 157-58, 95 L. Ed. 2d at 144, 107 S. Ct. at 1688.) The Court concluded that "major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the *Enmund* culpability requirement." *Tison*, 481 U.S. at 158, 95 L. Ed. 2d at 145, 107 S. Ct. at 1688.

The aggravating circumstance under which the defendant was found to be eligible for the death penalty does not require more. In the instant case, there was sufficient evidence that the defendant, a participant in these brutal offenses, was acting with reckless indifference to human life.

In this regard the defendant also argues that trial counsel was ineffective for failing to present additional evidence and argument on the issue of the defendant's

mental state and possible absence from the scene of the second murder. The defendant contends that Paula Gray had made statements indicating that the defendant was not present when Williams and Rainge shot and killed Larry Lionberg. The defendant points to Paula's grand jury testimony from May 1978. On that occasion Paula said that she, Williams, and Rainge took Larry to the creek, where he was shot, and she did not specifically mention that the defendant, or Adams, was present where the shooting occurred. Similarly, the defendant argues that counsel should have presented a statement by an officer who, in recounting Paula's 1978 grand jury testimony to the 1984 grand jury, did not say that Paula had said that the defendant was at the creek when Larry was killed. Paula did not testify before the grand jury in 1984.

Paula's testimony before the grand jury in 1978 does indicate that the defendant was present when Larry was shot. Asked whether Williams said anything to her following the shooting, Paula replied, "He told me not [to] tell the police. If I do he is going to come back and kill me and my family and then he got in the car and took [the defendant] home." Although it is not clear from the grand jury testimony exactly where the defendant was when Larry was shot, we do not believe that trial counsel was ineffective for failing to present that material at the defendant's sentencing hearing. The trial evidence was before the sentencing judge, having been introduced at that proceeding by stipulation, and that evidence indicated that the defendant was downstairs in the townhouse when Carol was murdered, and that the defendant was present when Larry was murdered. Even Paula's grand jury testimony, which the defendant contends should have been introduced for its impeaching or substantive use, indicates

that the defendant was still at the scene when the second murder occurred.

The defendant also argues that death is an excessive sentence in his case. In support of that contention the defendant notes that he did not have a prior criminal record, that he was not present during the murder of Carol, and that he did not himself shoot either murder victim. The defendant mentions also that he is married and has a family, and he asserts that the mitigating evidence introduced at trial indicates that he is a well-respected member of the community who has performed volunteer work at a church for a period of 20 years. The defendant notes that the legislature has singled out as statutory mitigating circumstances both the lack of prior criminal activity and absence from the scene during the commission of the act producing death. (See Ill. Rev. Stat. 1977, ch. 38, pars. 9—1(c)(1), (c)(5).) The defendant concludes that the statutory and nonstatutory mitigating circumstances in his case "do not bespeak a man with a malignant heart who must be permanently eliminated from society." *People v. Carlson* (1980), 79 Ill. 2d 564, 590; see also *People v. Buggs* (1986), 112 Ill. 2d 284 (vacating defendant's death sentence and remanding cause for imposition of sentence other than death); *People v. Gleckler* (1980), 82 Ill. 2d 145 (same).

The defendant in *Carlson* was sentenced to death for the murder of a police officer, which occurred as the defendant was attempting to avoid arrest for the murder of his former wife, an offense the defendant had committed earlier that day. In determining that the death penalty was an excessive sentence, the court noted that the defendant, a man in his early forties, had no prior record of criminal conduct, had been in ill health for some time preceding the murders, and had been upset over his former wife's plans to remarry. The court also noted

that the defendant, at the time of the police officer's murder, was making efforts to relay a sum of money to his son to provide for the child's support. The court believed that the defendant "would in all probability be leading a life acceptable to our society had not his unfortunate marital affair triggered this tragic sequence of events." *Carlson*, 79 Ill. 2d at 590.

The defendant in *Gleckler* was sentenced to death for the murder of two teen-aged boys. This court found the sentence to be excessive, relying on evidence that the defendant had "no criminal history, the personality of a doormat, and a problem with alcohol." (*Gleckler*, 82 Ill. 2d at 171.) Applying a limited form of comparative proportionality review to the death sentence in that case, the *Gleckler* court also believed that the defendant's conduct was less culpable than that of a codefendant who had received a prison term for the same offenses, and that the defendant's rehabilitative potential was not demonstrably worse than his codefendant's.

In *Buggs* the death penalty was found to be an excessive punishment for a man convicted of the murder of his wife and child, who perished in a house fire set by the defendant after an argument with his wife. The defendant in that case was in his forties, and he had a lengthy record of military service and no prior history of serious criminal conduct. The defendant had a drinking problem, and he set the fatal fire after arguing with his wife over her supposed infidelity. The court believed that death was an inappropriate punishment in that case, concluding, as in *Carlson*, that the defendant "would presumably be leading a life acceptable to our society" but for "this marital disharmony and a dispute which triggered this tragic sequence of events." *Buggs*, 112 Ill. 2d at 295.

Imposition of the death penalty requires, as a constitutional matter, an individualized consideration of both

the offender's character and the circumstances of his offense. (*Eddings v. Oklahoma* (1982), 455 U.S. 104, 110-12, 71 L. Ed. 2d 1, 8-9, 102 S. Ct. 869, 874-75.) The rationale common to *Buggs, Gleckler,* and *Carlson* was that imposition of the death penalty in those cases would not have served the deterrent or retributive purposes of capital punishment. (See *Gregg v. Georgia* (1976), 428 U.S. 153, 183, 49 L. Ed. 2d 859, 880, 96 S. Ct. 2909, 2930 (plurality opinion).) The special circumstances sufficient to preclude imposition of the death penalty in *Buggs, Gleckler,* and *Carlson* are not present in this case, however. Here, the defendant took part in the brutal series of rapes committed against Carol. She was shot and killed while the defendant was standing guard over Larry on the first floor of the vacant townhouse. Later, the defendant, Williams, and Rainge, accompanied by Paula Gray, led Larry to a nearby field, where he was shot by Williams and Rainge. Although the defendant in this case, like the defendants in *Buggs* and *Carlson,* had no prior record of serious criminal conduct, it cannot be said that this defendant was in great mental or emotional distress at the time of the offenses, or that his conduct was precipitated by some external cause—mitigating circumstances present in both *Buggs* and *Carlson.* The trial judge was aware of the defendant's record and character and his role in the offenses here. We see no reason to disturb the trial judge's decision to sentence the defendant to death.

The defendant next contends that his death sentence is disproportionate to the sentence available for a codefendant, Willie Rainge. Rainge was sentenced to natural life imprisonment after the sentencing jury in his case was unable to conclude unanimously that he should be sentenced to death. Although Rainge was eventually granted a new trial, his "acquittal" in the original death penalty proceeding would preclude imposition of the

death sentence upon his reconviction, as the defendant notes. See *Arizona v. Rumsey* (1984), 467 U.S. 203, 81 L. Ed. 2d 164, 104 S. Ct. 2305; *Bullington v. Missouri* (1981), 451 U.S. 430, 68 L. Ed. 2d 270, 101 S. Ct. 1852; *People v. Davis* (1986), 112 Ill. 2d 78.

Comparative proportionality review in death penalty cases is not required by the Federal Constitution (*Pulley v. Harris* (1984), 465 U.S. 37, 79 L. Ed. 2d 29, 104 S. Ct. 871), and it is not a feature of the capital sentencing process in Illinois (*People v. King* (1986), 109 Ill. 2d 514, 551; *People v. Kubat* (1983), 94 Ill. 2d 437, 502-04; *People v. Brownell* (1980), 79 Ill. 2d 508, 541-44). Nonetheless, this court has previously considered whether a sentence of death in a particular case is disproportionately harsh in comparison with the less severe sanction imposed on a codefendant convicted of the same crime. See, *e.g.*, *People v. Ashford* (1988), 121 Ill. 2d 55, 82-90; *People v. Erickson* (1987), 117 Ill. 2d 271, 302-03; *People v. Szabo* (1983), 94 Ill. 2d 327, 351-53; *People v. Gleckler* (1980), 82 Ill. 2d 145, 167-69, 171.

As we have indicated, the State sought the death penalty against Rainge, who chose to be sentenced by a jury. In the first stage of the proceeding the sentencing jury found Rainge eligible for the death penalty; in the second stage the jury was unable to conclude unanimously that there were no mitigating circumstances sufficient to preclude imposition of the death penalty. (See *People v. Rainge* (1983), 112 Ill. App. 3d 396, 408.) The defendant contends that Rainge's conduct was more culpable than his own—Rainge was present when Williams shot Carol, and Rainge himself shot Larry, after Williams had done so. We have already rejected the defendant's argument that death is an excessive disposition in this case. That some or all of the members of Rainge's sentencing jury chose not to impose the death penalty in

Rainge's case does not, in our view, render the defendant's own sentence disproportionate.

As a final matter, the defendant raises a number of challenges to the constitutionality of our State's death penalty statute, section 9—1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1987, ch. 38, par. 9—1). The defendant argues that several features of the capital sentencing scheme violate the eighth amendment's proscription of cruel and unusual punishment, as made applicable to the States by the fourteenth amendment. (U.S. Const., amends. VIII, XIV; see *Louisiana ex rel. Francis v. Resweber* (1947), 329 U.S. 459, 91 L. Ed. 422, 67 S. Ct. 374.) The same contentions have been rejected repeatedly by this court, and they require only brief discussion here.

The statute is not invalid for the discretion afforded to the prosecutor in deciding whether to seek the death penalty in a particular case. *(People v. Lewis* (1981), 88 Ill. 2d 129, 146; *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, 534-43.) As construed by our decisions regarding the role of sympathy in death penalty proceedings, the statute does not impermissibly restrict a capital defendant's presentation of mitigating evidence. *(People v. Crews* (1988), 122 Ill. 2d 266, 291-93; *People v. Orange* (1988), 121 Ill. 2d 364, 391.) The duplication of the statutory aggravating circumstances as criteria for use in imposing a term of natural life imprisonment does not mean that the capital sentencing scheme fails to narrow adequately, to a unique and cognizable group, those eligible for the death penalty. *(People v. Whitehead* (1987), 116 Ill. 2d 425, 463-65.) And we have rejected the contention that the sentencing scheme is unconstitutional because those defendants who must be tried with certain forms of special communicative assistance may not be sentenced to death. *Whitehead,* 116 Ill. 2d at 463-65.

The defendant also argues that various features of the capital sentencing scheme, in combination, invite its arbitrary and capricious imposition. We have previously held, however, that the statute is not unconstitutional even though it does not provide a system of comparative proportionality review (*People v. King* (1986), 109 Ill. 2d 514, 551; *People v. Stewart* (1984), 104 Ill. 2d 463, 499; *People v. Kubat* (1983), 94 Ill. 2d 437, 502-04; *People v. Brownell* (1980), 79 Ill. 2d 508, 541-44), does not require the sentencing authority to provide a written memorial of its findings (*King*, 109 Ill. 2d at 550-51; *Stewart*, 104 Ill. 2d at 497; *Kubat*, 94 Ill. 2d at 504; *People v. Gaines* (1981), 88 Ill. 2d 342, 383; *Brownell*, 79 Ill. 2d at 541-44), does not require the prosecution to provide pretrial notice of the aggravating circumstances it intends to use at the sentencing hearing (*Gaines*, 88 Ill. 2d at 369), does not impose on the State a burden of persuasion at the second stage of the hearing (*People v. Eddmonds* (1984), 101 Ill. 2d 44, 68; *People v. Free* (1983), 94 Ill. 2d 378, 421), and does not require the sentencing authority to make an additional determination that death is the appropriate sentence (*People v. Whitehead* (1987), 116 Ill. 2d at 462-63; *People v. Morgan* (1986), 112 Ill. 2d 111, 147). In view of our previous decisions, we reject the defendant's contention that those features of the capital sentencing scheme cumulatively render the process arbitrary and capricious.

For the reasons stated, the defendant's convictions and death sentence are affirmed. The clerk of this court is directed to enter an order setting Wednesday, May 17, 1989, as the date on which the sentence of death, entered in the circuit court of Cook County, is to be carried out. The defendant shall be executed by lethal injection in the manner provided by section 119—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1987, ch. 38, par. 119—5). The clerk of this court shall send a certified

copy of the mandate in this case to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution where the defendant is confined.

*Judgment affirmed.*

JUSTICE CALVO took no part in the consideration or decision of this case.

JUSTICE CLARK, dissenting:

Since I would reverse the defendant's convictions and sentences and remand the case for a new trial, I dissent.

To evaluate the defendant's claim that his attorney was incompetent, we must review the evidence. This was a close case. The State relied almost entirely on the testimony of Paula Gray, a witness whose credibility was—to put it mildly—subject to question. Even leaving aside the impeachment evidence available to defense counsel which he chose not to introduce, the jury was made aware of the following facts. Paula Gray was, by her own admission, an accomplice to the killings. She testified against the defendant in exchange for the State's promise not to retry her for murder. At a prior proceeding she had sworn under oath that she knew nothing about the offenses. When confronted by defense counsel with her prior inconsistent statements, she failed to deny or explain them, claiming in essence that she could not recall the particular questions and answers that defense counsel put to her.

Under these circumstances, her testimony must be viewed with great caution, both because she was an admitted accomplice to the murders (see *People v. Baynes* (1981), 88 Ill. 2d 225) and because she testified in exchange for the State's promise not to retry her on the most serious charge she could possibly face. Indeed, we have held that "where a witness has hopes of reward

from the prosecution, his testimony should not be accepted unless it carries within it an 'absolute conviction of its truth.' " (*People v. Ash* (1984), 102 Ill. 2d 485, 493, quoting *People v. Williams* (1976), 65 Ill. 2d 258, 267.) Nor was the State's case very much helped by its only other important witness, Charles McCraney. McCraney established—at best—the presence of Dennis Williams, Willie Rainge, and Kenneth Adams at the scene of the crime, but not the defendant. As for the blood type and hair sample evidence, I think that even the majority would agree that its probative value is extremely slight.

The defendant testified in his own behalf and provided detailed evidence of an alibi. We are not required to reweigh this evidence and overturn the jury's verdict for failure to prove the defendant guilty beyond a reasonable doubt. But given the weaknesses in the State's case, the presentation of a credible alibi defense means that the evidence was closely balanced, and that therefore the asserted deficiencies in the trial, and in defense counsel's performance, must be examined very carefully.

Given the problems with Paula Gray's credibility, is there really no reasonable probability that the jury would have acquitted the defendant if they had known:

(1) that Paula Gray had testified under oath, exonerating the defendant, not just once, but in four separate hearings, over a period of eight months? (These were: a preliminary hearing in June 1978, a suppression hearing in October 1978, her trial in October 1978, and her sentencing hearing in January 1979.)

(2) that Paula Gray was mentally retarded? ("The record contains a report on Paula from the Cook County Office of Special Education dated September 29, 1969. This gives her Wechsler Intelligence Quotient (IQ) as 65 verbal, 57 performance, 57 full. The report states that Paula has 'limited intellectual capac-

ities in really all spheres of function [and] continues to be in need of and to remain eligible for EMH classroom placement.' (EMH is understood to be an abbreviation for 'Educable Mentally Handicapped'.) A similar report in the record, dated June 12, 1974, shows an IQ of 69 verbal, 67 performance, and 64 full, with continued EMH classification. These figures classify Paula as mentally retarded. (Stedman's Medical Dictionary 1224 (5th unabr. law. ed. 1982).)" *United States ex rel. Gray v. Director, Department of Corrections* (7th Cir. 1983), 721 F.2d 586, 588.)

(3) that they were entitled to consider her prior testimony not only as indicative of her credibility, but also as substantive evidence of the defendant's innocence?

Given the closeness of the case and the lack of a credible explanation for counsel's failure to introduce this evidence, I would reverse because of counsel's ineffectiveness.

The majority's contrary conclusion is based on reasoning which I find difficult to follow. What, for example, is the basis for the majority's assertion that "Paula's prior assertions *** would not have provided any greater benefit to the defendant as substantive evidence than as impeachment"? (127 Ill. 2d at 34.) Had counsel invoked the applicable provisions of section 115—10.1 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1985, ch. 38, par. 115—10.1) he would have been able to have her prior testimony read to the jury and to have the jury instructed that they could consider her prior testimony as substantive evidence of the defendant's innocence. The majority's assertion that the failure to invoke section 115—10.1 made no difference makes a mockery of section 115—10.1, since the majority apparently believes that a jury cannot distinguish between impeachment and substantive evidence. Nor has the majority explained what possible strategic benefit counsel could

have sought to achieve by failing to make use of section 115—10.1. In a similar situation, the appellate court has held that counsel's failure to recognize and use prior inconsistent testimonial statements as substantive evidence renders counsel's representation constitutionally ineffective. *People v. Wilson* (1986), 149 Ill. App. 3d 293.

Were I to agree with the majority that counsel was not ineffective, I might also agree that the victim impact evidence introduced by the prosecution was not so prejudicial as to deprive the defendant of a fair trial. But given the weakness of the State's case, and defense counsel's failure to take full advantage of this weakness, I cannot agree that the introduction of the victim impact evidence was not harmful beyond a reasonable doubt. Where the prosecution introduces the victim's characteristics in his opening statement, deliberately elicits evidence of the same characteristics from witnesses, and again refers to the same characteristics in closing, I do not think we can say that the victim impact evidence was "incidental," or "nonprejudicial." These murders were heinous, but they were not made more so by the good character of the victims. The law does not distinguish between the murder of the "hardworking" and the murder of the lazy. The prosecutor's remarks could only have been intended to persuade the jury that it does.

But even were I to agree that the defendant's conviction should be affirmed, I could not also agree to affirm the defendant's death sentence. The defendant is a nontriggerman with no prior criminal record. The exact nature and degree of his participation in the murders is clouded by the infirmities in Paula Gray's testimony. Moreover, given the fact that one of the triggermen has been sentenced to life, the defendant's sentence of death is disproportionate and excessive. I would therefore have reversed the defendant's death sentence and remanded for the imposition of a sentence of natural life.