(No. 69889.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. IRVING RAMEY, Appellant.

*Opinion filed September 24, 1992.—Rehearing denied November 30, 1992.*

MILLER, C.J., concurring in part and dissenting in part.

Charles M. Schiedel, Deputy Defender, and Peter L. Rotskoff and John Anthony Palombi, Assistant Defenders, of the Office of the State Appellate Defender, of Springfield, for appellant.

Roland W. Burris, Attorney General, of Springfield, and Jack O'Malley, State's Attorney, of Chicago (Terence M. Madsen, Assistant Attorney General, of Chicago, and Renee Goldfarb and Kathleen F. Howlett, Assistant State's Attorneys, of counsel), for the People.

JUSTICE FREEMAN delivered the opinion of the court:

Defendant, Irving Ramey, was charged, by indictment, with three counts of murder, one count of robbery and one count of armed violence in connection with the stabbing death of Albert Oliver which occurred on August 22, 1986. After a bench trial in the circuit court of Cook County, defendant was convicted of armed violence, which conviction the trial court later vacated, and one count of murder in that he stabbed Albert Oliver knowing that such stabbing created a strong probability of death or great bodily harm. Defendant was acquitted of the remaining charges. After defendant waived a jury for sentencing, the trial court sentenced him to death for the murder of Oliver. Defendant's death sentence has

been stayed (134 Ill. 2d R. 609(a)) and the case is now before us for direct review (Ill. Const. 1970, art. VI, §4(b); 134 Ill. 2d R. 603).

## BACKGROUND

The State's evidence revealed the following. In the early morning hours of August 22, 1986, Chicago police officers Slakis and Rimkus were informed that there was a male individual, later identified as Albert Oliver, bleeding on lower Wacker Drive. Upon arriving at the scene, the officers found Oliver's body lying in a concrete planter which was filled with soil. About 10 feet away from the planter there was a pool of blood through which there were drag marks that ended at the body lying in the planter. Oliver was lying on his back and his face was covered with dirt and blood. Oliver's mouth and nostrils were packed with dirt. Oliver had multiple stab wounds in his back. While Oliver had clean white socks on his feet, he had on no shoes.

After Officers Slakis and Rimkus had been at the scene a short time, Officer Slakis noticed defendant in the area and asked him whether he had seen anything. He also asked defendant his name, address and phone number. Defendant responded that all he had seen was the body "laying there" and gave the officer the requested information.

On August 24, Chicago police detectives Griffin and Flynn, who were investigating Oliver's death, went to the address defendant had given Officer Slakis. There, the detectives first encountered defendant's uncle, who told them defendant lived in the basement apartment. After defendant's uncle called him on the telephone and told him the detectives wanted to speak to him, defendant opened his door and the detectives entered his apartment. While defendant was dressing, the detectives noticed an "expensive-looking" and blood-stained pair of

white athletic shoes next to defendant's bed. When asked if the shoes belonged to him, defendant stated that they belonged to Brendon Hutchinson, who lived in the second-floor apartment of the same building.

Upon being told that the detectives wanted to speak with Hutchinson, defendant called him on the telephone. The detectives then left defendant's apartment to meet Hutchinson and, upon doing so, asked Hutchinson if he had lent a pair of white athletic shoes to defendant. Hutchinson denied knowledge of any shoes. Immediately thereafter, defendant ran toward his basement apartment. Detective Griffin chased and caught defendant by the wrists at the door of his apartment. Defendant slammed the door on Detective Griffin's wrists and struggled to get through the door. Ultimately, the detectives subdued defendant, placed him under arrest and advised him of his *Miranda* rights.

After transporting defendant to the police station, the detectives showed the white athletic shoes to a friend of the victim. The victim's friend identified the shoes as belonging to Oliver. The detectives returned to the police station, where they again advised defendant of his *Miranda* rights. Defendant stated he understood. The officers questioned him concerning what he had seen on August 22 on lower Wacker Drive. Defendant responded that, upon leaving a nearby club at about 5 a.m., someone approached him and told him there was a dead body over by the Chicago river. Defendant walked over to the area indicated, found the body and took the shoes. Defendant also stated that he attempted to take some rings, but that he could not get them off of the fingers. When asked to explain the discrepancies between his present statement and a previous statement he had given Officers Slakis and Rimkus, wherein he stated that he had not touched the body, he admitted that he had lied when questioned at the scene and stated he was now

going to tell the truth. The officers summoned an assistant State's Attorney who questioned defendant further.

Subsequently, pursuant to defendant's consent, the detectives searched his apartment. They recovered a black gym bag and a wallet containing some papers bearing Oliver's name. After being advised by him of his *Miranda* rights, defendant, when questioned by Assistant State's Attorney William Frost, gave the following oral account.

Shortly after leaving the nearby club on the morning in question, he struck up a conversation with and borrowed a cigarette from an individual whom he met on the street level of Wacker Drive. (While defendant never named this individual, there is no dispute that he was Albert Oliver. Therefore, we hereinafter use Oliver's name for the sake of clarity.) They then went down to lower Wacker Drive and were at a bench, talking, when defendant borrowed another cigarette from Oliver. At that time, Oliver jumped up, grabbed defendant by the throat and pulled a knife. The two began struggling, defendant got hold of the knife and stabbed Oliver several times in the back. Oliver went down, got up suddenly and again grabbed defendant around the throat. During the struggle, defendant and Oliver fell into a planter with defendant on top. As Oliver attempted to choke defendant, defendant grabbed dirt and gravel from inside the planter and shoved it into Oliver's face about the nose and mouth. When the struggle ended, defendant took some personal property from Oliver, including a bag, shoes, money, a wallet with miscellaneous identification cards, and the knife. Upon exiting the elevated train he took home, he discarded the identification cards and knife.

Frost further testified as follows. He never observed any cuts or abrasions on or injuries to defendant. After

his oral statement, defendant refused to give a second statement.

Dr. Barry Lifshultz, a forensic pathologist with the Cook County medical examiner's office, performed an autopsy on the victim's body. The autopsy revealed that the victim died as the result of seven stab wounds to the back, four of which penetrated the body cavity. The victim also suffered five incised wounds to the face, four abrasions on the back of his right hand and an abrasion to his lower, middle back. The hand injuries could have been defensive in nature or, along with the back injury, the result of the victim's being dragged along a concrete surface. Additionally, there was no foreign matter, including soil or dust, in the victim's air passages. Dirt could only have entered the victim's airways or lungs if he had inhaled it while still alive. However, another possible explanation was that, although dirt might have been thrown in his face while he was alive, he did not inhale.

Finally, according to Christine Anderson, a Chicago police department serologist, the blood found on the victim's gym shoes was Type B human blood, the same as the blood sample taken from the victim.

Defendant's trial counsel cross-examined seven of the State's eight witnesses. After the State rested its case in chief, defendant rested without presenting any witnesses on his behalf.

In his closing argument, defendant's trial counsel asserted that defendant had killed the victim in self-defense. The trial court found defendant guilty of murder in that he stabbed Albert Oliver, without lawful justification, knowing that his acts were likely to result in death or great bodily harm. Thereafter, defendant was informed that the State would seek the death penalty. After defendant waived a jury for sentencing, the trial court, first, found him eligible for the death penalty and,

then, after hearing evidence in aggravation and mitigation, imposed that penalty.

## APPOINTMENT OF NEW COUNSEL TO ARGUE *PRO SE* MOTION ALLEGING INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant first argues that the trial court erred in failing to appoint new counsel to argue his *pro se* post-trial motion alleging ineffective assistance of counsel and that, based on *People v. Krankel* (1984), 102 Ill. 2d 181, this cause should be remanded for an evidentiary hearing. We disagree.

In so arguing in reliance upon *Krankel*, defendant ignores this court's holding in *People v. Nitz* (1991), 143 Ill. 2d 82. In *Nitz*, this court held that *Krankel* requires a trial court to conduct a preliminary investigation into a defendant's *pro se* allegations of ineffective assistance of counsel. If the trial court finds the allegations to be spurious or pertaining only to trial tactics, new counsel to represent the defendant should not be appointed. Only if the defendant's allegations indicate that trial counsel neglected the defendant's case, should the court appoint new counsel to represent the defendant. *Nitz*, 143 Ill. 2d at 134-35.

After reviewing the record, we are sufficiently convinced that defendant's allegations of ineffective assistance either were spurious, related to trial tactics or not supported by the record. Therefore, we find that the trial court did not err in declining to appoint new counsel for defendant to argue his post-trial motion of ineffective assistance of counsel.

## RIGHT TO EVIDENTIARY HEARING ON MOTION TO SUPPRESS SEIZURE OF THE VICTIM'S ATHLETIC SHOES

Defendant next argues that the trial court erred in

denying an evidentiary hearing on his second motion to suppress evidence seized *before* his arrest, specifically the victim's athletic shoes. Defendant asserts that in a first motion to suppress, he was seeking the suppression of evidence which was seized *after* his arrest and, thus, reasons that collateral estoppel, the basis of the trial court's challenged ruling, was not applicable to his second motion to suppress. We disagree.

After reviewing the record, we find the distinction drawn by defendant between his motions to suppress specious and without merit. In his first motion to suppress, defendant sought the suppression of "the direct and indirect" products of his arrest, including "[p]hysical evidence discovered directly and indirectly as a result of [his] arrest and detention; *i.e.*, one pair of white athletic shoes." As such, whether the victim's athletic shoes were seized from defendant before, at or after the time of his arrest, the issue of the validity of their seizure was fully litigated as part of the trial court's disposition of defendant's first motion to suppress. The trial court thus correctly applied the doctrine of collateral estoppel to bar relitigation of that issue pursuant to defendant's second motion to suppress.

## DENIAL OF CONSTITUTIONAL RIGHTS BY PRESENTATION OF DEFENSE OF SELF-DEFENSE AGAINST DEFENDANT'S WISHES

Defendant next argues that he was denied his constitutional rights to due process and effective assistance of counsel when his trial counsel presented a defense of self-defense against his wishes. We disagree.

Contrary to defendant's assertion, the defense theory to be presented to the trier of fact is not one of the matters which a defendant has the ultimate right to decide. Rather, it is a matter of trial tactics or strategy which is ultimately left for trial counsel.

The ABA Standards for Criminal Justice provide that three decisions are ultimately for the defendant in a criminal case after full consultation with his attorney: what plea to enter; whether to waive a jury trial; and whether to testify in his behalf. (ABA Standards for Criminal Justice §4—5.2 (2d ed. Supp. 1986).) A defendant in a criminal case also has a fundamental right to decide whether to appeal. *Jones v. Barnes* (1983), 463 U.S. 745, 751, 77 L. Ed. 2d 987, 993, 103 S. Ct. 3308, 3312; *People v. Campbell* (1984), 129 Ill. App. 3d 819, 821.

Beyond these four decisions, however, trial counsel has the right to make the ultimate decision with respect to matters of tactics and strategy after consulting with his client. Such matters include what witnesses to call, whether and how to conduct cross-examination, what jurors to accept or strike and what trial motions should be made. (ABA Standards for Criminal Justice §4—5.2 (2d ed. Supp. 1986).) Such matters also include the defense to be presented at trial. (See, *e.g., People v. Mikell* (1991), 217 Ill. App. 3d 814, 821; *People v. Gallardo* (1983), 112 Ill. App. 3d 764, 770 (holding that decision to rely upon one theory of defense to exclusion of all others is generally a matter of trial tactics or strategy).) Consequently, we do not find that trial counsel's advocacy of the theory of self-defense denied defendant due process.

Defendant also asserts that trial counsel's advocacy, against his wishes, of the theory of self-defense constituted ineffective assistance of counsel. With respect to matters of trial strategy, such as the defense theory relied upon at trial, this court has variously held that the evaluation of defense counsel's conduct cannot properly extend to areas involving the exercise of professional judgment, discretion or trial tactics (*People v. Franklin* (1990), 135 Ill. 2d 78, 118) and that a claim of ineffective assistance of counsel cannot be predicated upon a matter of defense strategy *unless* the strategy was unsound

(*People v. Barrow* (1989), 133 Ill. 2d 226, 248). However, inasmuch as it is defendant's ultimate burden in claiming ineffective assistance of counsel to establish a reasonable probability that, but for that assistance, the trial result would have been different (see, *e.g., People v. Hillenbrand* (1988), 121 Ill. 2d 537), we need not resolve the seeming inconsistency between the *Franklin* and *Barrow* decisions.

With respect to the prejudice which he suffered from this claimed ineffective assistance, defendant argues that his trial counsel's concession that defendant killed the victim was sufficient to undermine the proper functioning of the adversarial process. Unfortunately for defendant, stated in its entirety, the test is that the proper functioning of the adversarial process was so undermined by counsel's conduct that the trial cannot be relied upon as having produced a just, *i.e.*, reliable, result. (*People v. Albanese* (1984), 104 Ill. 2d 504, 525.) However, in view of the overwhelming evidence of defendant's guilt, including defendant's statements to the police after his arrest, we cannot reasonably find that defendant's trial did not produce a reliable and just result.

With respect to that overwhelming evidence, defendant argues that defense counsel's concession of his involvement in the murder was particularly inappropriate given his testimony at the pretrial suppression hearing in which he denied any involvement in the killing. Defendant reasons that, given that testimony, the assertion of a self-defense theory at trial only served to diminish his credibility. We find this assertion unavailing to defendant for two separate, interrelated reasons.

First, inasmuch as defendant did not testify at trial, there simply was no credibility issue to undermine by defense counsel's concession. The fact that defendant testified in pretrial proceedings does not mean that the trial

court could take that testimony into consideration in evaluating defendant's defense at trial. Second, because the court: (1) did not believe defendant's testimony of noninvolvement in the murder during the pretrial stage, (2) believed the police officers' testimony to the opposite effect during pretrial, and (3) heard the latter testimony again during the trial, defendant had no credibility which could have been undermined by his counsel's argument of a self-defense theory.

In view of the foregoing, we find that defense counsel's concession that defendant killed the victim, albeit in self-defense, did not undermine the proper functioning of the adversarial process, *i.e.*, did not change the result of the trial. Therefore, this particular claim of ineffective assistance of counsel is without merit.

Defendant cites *People v. Chandler* (1989), 129 Ill. 2d 233, in support of his claim of ineffective assistance of counsel. Therein, defense counsel conceded in his closing argument that the defendant had participated in a home invasion and robbery of the victim but should not be found guilty of murder because he did not personally kill the victim. This court found that defense counsel had rendered ineffective assistance to the defendant because, *inter alia*, his argument revealed a lack of understanding of the felony murder rule.

*Chandler* is distinguishable from this case for the simple reason that defense counsel's concession therein, the defendant's participation in the felonies of home invasion and robbery, mandated, in view of the murder of the victim, a verdict of guilty of murder based on a felony murder theory.

The additional element necessary for a finding of guilt of felony murder was indisputable in *Chandler*. The same cannot be said of the additional element necessary for a finding of guilt of murder in this case—the lack of belief in the need to use deadly force. Moreover, it can-

not be said of defense counsel in this case, as it was of defense counsel in *Chandler*, that he otherwise failed to subject the State's case to meaningful adversarial testing. Therefore, *Chandler* is of no assistance to defendant.

## VOLUNTARINESS OF DEFENDANT'S IN-CUSTODY STATEMENTS

Defendant next asserts that his alleged inculpatory statements to the police were involuntary because he was held incommunicado and never allowed to use the telephone while detained prior to making the statements, in violation of his constitutional rights to due process and his statutory right to use the telephone. U.S. Const., amend. XIV; Ill. Const. 1970, art. I, §§2, 8; Ill. Rev. Stat. 1989, ch. 38, par. 103—3.

The State asserts that defendant never asked to use the telephone during his detention by the Chicago police. However, the record clearly reveals: (a) that defendant did not ask to use the telephone during the time that he was left handcuffed to the wall in an interrogation room; and (b) the unrebutted, uncontradicted and uncontroverted assertion by defendant that he did ask to use the telephone just before making the alleged inculpatory statement during questioning by Assistant State's Attorney Frost. The latter fact notwithstanding, we do not find that defendant has carried his burden of establishing the involuntariness of his in-custody statements.

The test of the voluntariness of a confession is whether the confession was made without compulsion or inducement of any sort and whether the defendant's will was overborne at the time of the confession; the decision is a factual determination to be made by the trial court based on the totality of the circumstances and will not be reversed unless it is contrary to the manifest weight of all the evidence. (*People v. Fickett* (1990), 204 Ill.

App. 3d 220.) Similarly, the credibility of the witnesses regarding the voluntariness of a statement is to be determined by the trial court and that determination will likewise not be reversed unless contrary to the manifest weight of the evidence. *People v. Cook* (1990), 201 Ill. App. 3d 449.

The record evidence with respect to the voluntariness of defendant's alleged confession was conflicting. The trial court found defendant's testimony on that issue less credible than that of the State's witnesses. We cannot say that the denial of defendant's motion to suppress his in-custody statements to the police was against the manifest weight of the evidence.

In this regard, even assuming that, as defendant testified during the hearing on his motion to suppress, he asked, but was not permitted, to use the telephone prior to making his alleged inculpatory statement, that fact would not invalidate defendant's statement as a matter of law. The remaining evidence in this case relevant to the issue, unlike that in *Haynes v. Washington*, (1963), 373 U.S. 503, 10 L. Ed. 2d 513, 83 S. Ct. 1336, does not support the conclusion that defendant's will was overborne. See *People v. Terrell* (1989), 132 Ill. 2d 178, 200.

Specifically, in contrast to the situations in *Haynes, Davis v. North Carolina* (1966), 384 U.S. 737, 16 L. Ed. 2d 895, 86 S. Ct. 1761, and *Culombe v. Connecticut* (1961), 367 U.S. 568, 6 L. Ed. 2d 1037, 81 S. Ct. 1860, wherein the defendants were held incommunicado for 5, 16, and 5 days, respectively; and comparably to the situation in *Terrell*, wherein the defendant was held for only 8 hours, at most, in presumably incommunicado detention, defendant here was held for only approximately 6 hours, at most, in incommunicado detention before giving his alleged inculpatory statement to the police. Moreover, according to several of the State's witnesses, defendant, unlike the defendant in *Haynes* and like the defendant in *Terrell*, was

advised of his *Miranda* rights several times before giving his alleged inculpatory statement. While defendant consistently testified that he was never advised of his *Miranda* rights, the trial court found the State's evidence to the opposite effect more credible. We do not find this conclusion contrary to the the manifest weight of the evidence. As such, we find no indication in the record before us that defendant's will was overborne and that his alleged inculpatory statement was involuntary. See *People v. Terrell* (1989), 132 Ill. 2d 178, 201.

## VALIDITY OF DEFENDANT'S WAIVER OF A JURY FOR SENTENCING HEARING

Defendant next asserts that his waiver of a jury for his capital sentencing hearing was not knowing, intelligent or voluntary where neither he nor his trial counsel knew that the vote of only one juror would preclude imposition of the death penalty. We disagree.

Contrary to defendant's implication, it is not the law in Illinois that, for a jury waiver at a capital sentencing hearing to be knowing, intelligent and voluntary, a defendant must be expressly advised of the nonunanimity rule, *i.e.*, that the vote of a single juror will preclude imposition of the death penalty. Nor is it the law in Illinois that, for a valid jury waiver at a capital sentencing hearing, the defendant must be advised that the decision of the jury to impose the death penalty must be unanimous. Rather it is sufficient, for a valid jury waiver, that, as occurred here, the trial court explain to the defendant that he is waiving the right to have a jury consider the capital sentencing issues and that the sentencing decision would, therefore, be made by the judge alone. *People v. Ruiz* (1989), 132 Ill. 2d 1, 20-21.

In view of the state of the law in Illinois on the instant issue, the fact that defendant's trial counsel did not know of the nonunanimity rule and therefore could

not have advised defendant of the rule before he exercised his jury waiver is simply of no moment. (*Cf. People v. Ruiz*, 132 Ill. 2d at 21 (holding that trial counsel was not ineffective for failing to advise defendant of the nonunanimity rule).) Similarly, the fact that defendant, as he asserted in his post-trial motion and asserts on appeal, would not have waived the jury had he known of the nonunanimity rule is also of no assistance to him. Inasmuch as a defendant need not know of the nonunanimity rule before his jury waiver will be held to have been knowing, intelligent and voluntary, what he would have done had he known of the rule is simply irrelevant to that determination and is an insufficient basis for a contrary conclusion.

In sum, notwithstanding that neither defendant nor his trial counsel knew of the nonunanimity rule either before or after the trial court's admonishments with respect to the waiver of a jury at defendant's sentencing hearing and, further, notwithstanding that he would not have waived a jury had he known of the rule, the record establishes that his waiver was sufficiently knowing, intelligent and voluntary to be valid.

## INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant next asserts that his trial counsel rendered ineffective assistance for three reasons other than those asserted above.

First, defendant asserts that his counsel was ineffective for the reason that he did not know, and therefore could not have advised defendant of, the nonunanimity rule. As we noted above, however, under *Ruiz*, trial counsel is not ineffective for failing to advise a defendant of the nonunanimity rule where he presumably knows the rule. As such, that trial counsel fails to advise a defendant of that rule because of his lack of awareness thereof is of no moment to an ineffectiveness claim.

Second, defendant asserts that his counsel was ineffective because he failed to obtain a transcript of the testimony of a witness in an earlier prosecution against defendant for murder. Defendant asserts the transcript would have enabled defense counsel to impeach that same witness' testimony at defendant's sentencing hearing.

This assertion of error is inadequate given defendant's concession that he cannot meet the requirement of showing that he was prejudiced thereby. (*Hillenbrand*, 121 Ill. 2d 537.) In this respect, defendant asserts that he is, at least, entitled to an evidentiary hearing on this alleged instance of ineffective assistance. However, in view of our earlier rejection of this argument with respect to all the claims of ineffective assistance raised in defendant's post-trial motion, we also reject it with respect to this particular claim.

Third, defendant asserts that he received ineffective assistance due to counsel's failure to investigate and present more than two mitigation witnesses at his sentencing hearing. In view of defendant's concession of an inability to show that he was prejudiced as a result of this alleged ineffectiveness and our prior holding that he was not entitled to an evidentiary hearing on any of his claims of such assistance, we reject this claim in its entirety.

## DEFENDANT'S ELIGIBILITY FOR THE DEATH PENALTY BASED ON RECKLESS INDIFFERENCE TO HUMAN LIFE

Prefatorily, we note that, for the purpose of proving an aggravating factor rendering defendant eligible for the death penalty and to obtain that sentence, at defendant's sentencing hearing, the State adduced evidence of defendant's involvement in the murder of Derrick

Wilkinson which resulted from a home invasion in Hazel Crest, Illinois, in July 1986.

With that fact in mind, we address defendant's first argument with respect to his death sentence. Specifically, he argues that imposition of the death penalty in this case violated the eighth and fourteenth amendments in that, contrary to the trial court's conclusion, he was not eligible for the death penalty based on a finding that the murders of Wilkinson and Oliver were committed with reckless indifference to human life.[1] We agree.

At the time of the commission of the murders of Wilkinson and Oliver in 1986, section 9—1(b)(3) of the Criminal Code of 1961 made a defendant convicted of the murders of two or more individuals eligible for the death penalty if the deaths resulted from either an intent to kill more than one person or from separate premeditated acts. (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(3).) In 1983, this court construed this language to include the mental state of knowledge as well as intent. Specifically, this court construed section 9—1(b)(3) as allowing imposition of the death penalty where the defendant acted with knowledge that his acts would result in death or great bodily harm as well as intent to kill. This court so construed section 9—1(b)(3) based upon its conclusion that the limitation of the death penalty, in multiple-murder situations, to those individuals whose acts exhibit only an intent to kill or premeditation would defeat the legislative intent that two or more convictions for murder, falling within section 9—1(a), may support a death penalty. *People v. Davis* (1983), 95 Ill. 2d 1, 31-36.

---

[1]Defendant does not raise this argument until well into the body of his appellate brief. However, we choose to address it as the first sentencing issue because, inasmuch as we find it meritorious, it obviates the need to address any other issues relating to the conduct of defendant's sentencing hearing.

Subsequently, this court held that the mental state of reckless indifference to human life, as well as intent to kill or knowledge that death or great bodily harm would result, also rendered a defendant eligible for the death penalty under section 9—1(b)(3). (*People v. Jimerson* (1989), 127 Ill. 2d 12, 46-49.) In so doing, this court noted that section 9—1(b)(3) had been amended to provide that the death penalty could be imposed where multiple murders resulted from either an intent to kill more than one person or from separate acts which the defendant knew would cause death or create a strong probability of death or great bodily harm. Pub. Act 85—404, eff. Jan. 1, 1988 (amending Ill. Rev. Stat. 1987, ch. 38, par. 9—1(b)(3)).

The trial court in this cause found defendant eligible for the death penalty on the basis of this court's holding in *Jimerson*. Specifically, it found that defendant's participation in the acts which led to the deaths of Derrick Wilkinson, as established by the testimony of John Campbell at the trial of defendant for that murder, and of Albert Oliver exhibited, at least, a reckless indifference to human life. Defendant argues that, in applying *Jimerson* retroactively, the trial court also violated the prohibition against *ex post facto* laws. We agree.

As defendant notes, the prohibition against such laws applies to new judicial interpretations of statutory law as well as to statutory laws in and of themselves.

In *Bouie v. Columbia* (1964), 378 U.S. 347, 12 L. Ed. 2d 894, 84 S. Ct. 1697, the United States Supreme Court held that convictions for violations of a South Carolina statute violated the due process clause of the fourteenth amendment where the statute had not been construed as prohibiting the acts leading to the defendants' arrests until after their commission. In so doing, the court noted that the deprivation of the right of fair warning by a statute of the conduct that it criminalizes

can result from either vague statutory language or from an unforeseeable and retroactive judicial expansion of narrow and precise statutory language. It further noted that an unforeseeable judicial enlargement of a criminal statute also "operates precisely" like a constitutionally proscribed *ex post facto* law, *i.e.*, a law which, *inter alia*, aggravates a crime or makes it greater than it was when committed. As such, the due process clause barred State courts from achieving the same result as State legislatures were barred from achieving by the *ex post facto* clause. 378 U.S. at 352-54, 12 L. Ed. 2d at 899-900, 84 S. Ct. at 1702-03.

*Bouie* makes it clear that the trial court erred in applying *Jimerson* and *Tison v. Arizona* (1987), 481 U.S. 137, 95 L. Ed. 2d 127, 107 S. Ct. 1676, upon which *Jimerson* chiefly relied, retroactively to this case to find defendant eligible for the death penalty. Reckless indifference to human life in participating in the murders of two or more persons cannot be availed of to render a defendant eligible for the death penalty if the defendant's acts occurred prior to the announcement of this court's decision in *Jimerson*. In view of this holding, we need not consider defendant's invitation to reconsider this court's holding in *Jimerson* as an unwarranted judicial expansion of a constitutionally mandated aggravating factor for death penalty purposes.

The evidence adduced by the State at the eligibility phase of the sentencing hearing might have supported a finding by the trial court, in accordance with *Davis*, that defendant's participation in the Wilkinson and Oliver murders was with the requisite knowledge. However, in view of the trial court's error with respect to that evidence, which we address below, we find that it was wholly incompetent for the purpose of determining defendant's eligibility for the death penalty. Moreover, we must note that we cannot make a *de novo* finding

that defendant's participation in the Wilkinson and Oliver murders exhibited a knowledge that their deaths or great bodily harm would result therefrom. To do so would deny defendant his statutory right to have his eligibility for the death penalty decided by a trial court or jury. (*People v. Ramey* (1992), 151 Ill. 2d 498, 549-50.) This, however, does not mean that upon remand the State would be precluded from attempting to establish such knowledge.

In this regard, we reject defendant's invitation to also reconsider this court's holding in *Davis* that knowledge that death or great bodily harm is likely to result is a sufficient mental state under section 9—1(b)(3) to render a defendant eligible for the death penalty. Defendant asserts that this holding, like the court's holding in *Jimerson*, also constitutes an unwarranted expansion of a constitutionally mandated aggravating factor. That assertion notwithstanding, defendant offers no compelling reason for this court to retreat from its conclusion in *Davis* upon which that holding was based.

It is true, as defendant notes, that when statutory language is clear and certain, a court is limited to enforcing the statute as enacted. (*People ex rel. Gibson v. Cannon* (1976), 65 Ill. 2d 366.) However, this assertion ignores that the conclusion this court reached in *Davis* was the result of an ambiguity which we found, albeit implicitly, in subsection (b)(3) of section 9—1 in light of the fact that subsection (a) did not define murder in terms, exclusively, of intent to kill or, at all, in terms of premeditation. It was on the basis of that ambiguity that this court properly looked to the legislative intent underlying section 9—1(b)(3) to determine the meaning of the language used. That having been the case, defendant's reliance on the plain language of subsection (b)(3) does not convince us that the holding in *Davis* was erroneous. We thus adhere to that holding.

Having determined that defendant was not eligible for the death penalty based on his exhibiting a reckless indifference to human life in his involvement in the Wilkinson murder and his commission of the Oliver murder, we hereinafter address only those alleged errors with respect to defendant's sentencing which more than likely will recur upon remand. We also address defendant's constitutional attacks upon the Illinois death penalty statute. However, in view of our recent affirmance of his conviction for the Wilkinson murder (*People v. Ramey* (1992), 151 Ill. 2d 498), we need not address defendant's additional arguments that, if we dismiss the charges in that case based on the right to a speedy trial or reverse that conviction, we must dismiss the charges or vacate defendant's death sentence in this case.

## DEFENDANT'S RIGHT TO SHOW POSSIBLE MOTIVE FOR TESTIMONY OF STATE'S WITNESS AT PRIOR MURDER PROSECUTION OF DEFENDANT

In the first phase of defendant's sentencing hearing, the State attempted to establish defendant's eligibility for the death penalty through the testimony of John Campbell. After admitting that he had testified against defendant in his earlier trial for the murder of Derrick Wilkinson and that he had conversations about Wilkinson's murder with defendant while they were both confined to the Cook County Department of Corrections in 1986, Campbell declined to answer any further questions based on his fifth amendment rights. After a public defender appointed to represent Campbell reported to the trial court that there was no constitutional basis for Campbell's refusal to testify, the trial court ordered him to do so. Thereafter, Campbell claimed that he could not recall the content of his conversations with defendant or his testimony concerning their content at defendant's earlier trial.

On cross-examination, defense counsel was prohibited from questioning Campbell about what consideration he received from the State for his testimony at defendant's earlier trial.

The State next called Henry Simmons, the prosecutor in defendant's trial for the Wilkinson murder, for the purpose of introducing Campbell's testimony at that trial concerning the content of his conversations with defendant while they were confined to the Cook County Department of Corrections.

On cross-examination, defense counsel was prohibited from questioning Simmons concerning whether Campbell, during his cross-examination at the earlier trial, stated that he had hoped that the State would take his testimony into consideration in his sentencing for the offenses with which he was charged at that time.

Defendant asserts that he was denied his right to confront the witnesses against him when the trial court prohibited him from questioning Campbell and Simmons concerning Campbell's possible motive for testifying therein. We agree.

The right to cross-examine a witness concerning his biases, prejudices or ulterior motives is protected by both the Federal and the State Constitutions. (U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, §8; see *Davis v. Alaska* (1974), 415 U.S. 308, 39 L. Ed. 2d 347, 94 S. Ct. 1105.) Moreover, the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination. The widest latitude should be given the defense on cross-examination when trying to establish a witness' bias or motive. (*People v. Gonzalez* (1984), 104 Ill. 2d 332, 337.) A trial court has no discretion to deny a defendant this right, but only to preclude repetitive or unduly harassing interrogation. In this regard, a defendant need not show interest or motive in that any prom-

ises of leniency have, in fact, been made to the witness by the State or that any expectations of special favor exist in the mind of the witness, before cross-examining a witness as to possible bias. Further, the defense is entitled to inquire into such promises or expectations whether they are based on fact or are simply imaginary. *People v. Triplett* (1985), 108 Ill. 2d 463, 475-76.

Applying the foregoing principles in this case, we conclude that the trial court erred in restricting defendant's attempts to inquire into Campbell's possible motives for testifying at defendant's earlier trial. We further conclude that it denied defendant a substantial right and that this denial constitutes plain error which we may review notwithstanding defendant's failure to preserve the error by including it in his post-trial motion. (134 Ill. 2d R. 615.) Moreover, we also conclude, as we noted above, that Campbell's testimony was thus incompetent for all purposes, including the purpose of showing that defendant participated in the Wilkinson and Oliver murders with knowledge that his acts were likely to result in death or great bodily harm.

In response to defendant's arguments, the State asserts, without citation to any authority, that the trial court properly prohibited the cross-examination of Campbell with respect to what consideration he received from the State as outside the scope of direct examination, which went only to his recollection of his prior testimony. The State also asserts, again without citing any supporting authority, that the trial court properly prohibited the attempted cross-examination of Simmons as not impeaching his testimony, which went only to the substance of Campbell's former testimony.

In so asserting, the State patently ignores the well-settled principles which protect and give a broad compass to the constitutional right of cross-examination. These arguments also ignore that Campbell was called as

a witness to establish defendant's involvement, through his own words, in a second unrelated murder. When Campbell claimed he was unable to independently recall defendant's statements and, thus, would not testify directly thereto, the State was forced to follow a recollection-of-prior-testimony line of questioning with him. Moreover, when Campbell persisted in claiming no recollection of his testimony at the earlier trial after it was read to him, the State was also forced to call Simmons to establish the content of Campbell's testimony. At all times, the State's intent was to introduce the substance of Campbell's testimony given at the earlier trial, to establish that defendant had been involved in another murder, not simply to determine whether he or Simmons recalled that testimony.

As such, it is ludicrous for the State to assert that defendant's attempt to show Campbell's possible motive for testifying as he did at the earlier trial was outside the scope of Campbell's direct examination. It is equally ludicrous for the State to assert that defendant's attempt to show that same motive for Campbell's testimony in cross-examining Simmons was properly prohibited because it impeached Campbell, not Simmons. Given the State's purpose in calling Campbell and Simmons, Campbell's motive was as legitimate a line of inquiry in the instant cause as it was at the earlier trial. The trial court's denial of defendant's right of confrontation also requires us to vacate defendant's death sentence and to remand the cause for a new sentencing hearing.

Moreover, given the trial court's prohibition of the cross-examination at issue, we conclude that the court did not consider Campbell's possible motive to testify falsely against defendant in determining defendant's eligibility for the death penalty. As such, we cannot conclude that the trial court's error was harmless beyond a reasonable doubt. In so holding, we note that while we

have recently affirmed defendant's conviction for the Wilkinson murder, the trial court could not have taken that fact into consideration in judging Campbell's credibility at the trial of that offense.

The State notes that, notwithstanding the prohibition of the cross-examination at issue, the trial court heard testimony revealing Campbell's extensive criminal record and his serving, at the time of his testimony in this cause, a lenient sentence of six years for a third armed robbery conviction. However, we cannot conclude that the trial court did, or even could, infer from those revelations, alone, that Campbell had a possible motive to testify falsely against defendant and took that motive into consideration in determining whether defendant was proved eligible for the death penalty.

## ADMISSION OF CAMPBELL'S FORMER TESTIMONY

Defendant next asserts that the admission of Campbell's testimony of his earlier murder trial also denied him his right of confrontation as well as a fair sentencing hearing. We disagree.

Specifically, defendant asserts that a sincere lack of memory may give rise to a finding of unavailability of a witness and would make the witness' testimony at a former proceeding admissible as an exception to the right of confrontation. However, defendant further asserts, citing *People v. Johnson* (1987), 118 Ill. 2d 501, mere reluctance or unwillingness to testify, as that exhibited by John Campbell in this case, does not constitute unavailability for purposes of introducing a witness' former testimony.

Contrary to defendant's assertion, this court's holding in *Johnson* is not dispositive of the instant issue. In *Johnson*, the court was concerned with the propriety of the use of the videotaped testimony of two minor chil-

dren, including the victim, at the trial of a defendant charged with aggravated indecent liberties with a child. Specifically, the issue was whether the testimony of the children was shown to be unavailable at trial in the sense contemplated by our Rule 414 where the children had merely exhibited reluctance to testify in open court. (134 Ill. 2d R. 414.) That rule allows the taking of evidence depositions in criminal cases under certain circumstances, including a showing of a substantial possibility that the testimony of the deponent would be unavailable at the time of trial.

In deciding the issue in *Johnson*, this court looked to the definitions of "unavailability" in Federal Rule of Evidence 804, which provides that certain hearsay, including former testimony, is not inadmissible if the declarant is unavailable as a witness. Rule 804 provides that unavailability as a witness includes situations in which the declarant, *inter alia*:

"(2) persists in refusing to testify concerning the subject matter of [his] statement despite an order of the court to do so; or

(3) testifies to a lack of memory of the subject matter of [his] statement." Fed. R. Evid. 804.

Ultimately, this court concluded that "[t]he reasons for unavailability which are acceptable under Federal Rule 804—privilege, persistent contemptuous refusal to testify, failure of memory, death or illness, etc.—are substantial and therefore legally cognizable." (*Johnson*, 118 Ill. 2d at 509.) However, the court held that mere unwillingness or reluctance to testify did not rise to the high level of the Federal Rule 804 standards and, thus, could not constitute excusable unavailability under our Rule 414. This court therefore reversed the defendant's conviction.

Clearly, by holding in *Johnson* that mere unwillingness to testify cannot be equated with unavailability un-

der our Rule 414, the court was speaking of unwillingness in the sense of the reluctance to testify displayed by the minor witnesses whose testimony was at issue. It was not speaking of unwillingness in the sense in which John Campbell could be said to have been unwilling to testify positively against defendant in this cause. As such, the specific holding of *Johnson* is of no assistance to defendant. Similarly unavailing is his assertion that a lack of memory must be "sincere" before the witness professing it will be found to be unavailable for purposes of admitting his former testimony of any assistance to him.

Contrary to defendant's assertion that lack of memory must be sincere for purposes of unavailability of a witness, all that is needed for the application of that definition of unavailability is "a claim" of lack of memory, whether genuine or not. The plain language of Federal Rule 804 (" 'Unavailability as a witness' includes situations in which the declarant \*\*\* *testifies* to a lack of memory" and "[a] declarant is not unavailable \*\*\* if his \*\*\* *claim* of lack of memory \*\*\* is due to the procurement or wrongdoing of the proponent of his statement" (emphasis added)) clearly reveals that lack of memory, whether genuine or feigned, constitutes unavailability for purposes of introducing his hearsay statement.

Similarly to our rejection of defendant's gloss upon the lack of memory definition of unavailability, we also reject the State's attempt to equate Campbell's lack of memory to a contemptuous refusal to testify.

Contrary to the State's assertion, refusal to testify after being so ordered by the court, as a ground for admitting otherwise inadmissible hearsay, requires a positive statement indicating an explicit refusal to testify, an explicit order by the court that the defendant do so and persistence in that refusal even thereafter. (See, *e.g.,* *United States v. Oliver* (2d Cir. 1980), 626 F.2d 254;

*United States v. Gonzalez* (5th Cir. 1977), 559 F.2d 1271.) Admittedly, Campbell's assertion of his fifth amendment rights when initially questioned could be equated to an explicit refusal to testify. However, upon the trial court's determining that Campbell had no fifth amendment privilege and ordering him to testify, Campbell did not persist in his refusal. Rather, he then testified to the best of his recollection. It is manifest that his lack of recollection may have been feigned. However, that fact does not support equating a claim of lack of recollection to an explicit refusal to testify.

In view of the foregoing, we conclude that John Campbell was unavailable as a witness at defendant's sentencing hearing for purposes of introducing his otherwise hearsay testimony given at defendant's former murder trial. While he did not contemptuously refuse to testify, Campbell did exhibit the lack of memory contemplated under Federal Rule of Evidence 804 for purposes of introducing that testimony thereunder and, thus, under Illinois law as well. See *Johnson*, 118 Ill. 2d 501.

## CONSTITUTIONALITY OF THE ILLINOIS DEATH PENALTY PROCEDURE

Next, defendant, as have many defendants before him, challenges the constitutionality of the Illinois death penalty statute. In his brief, the title of defendant's first constitutionality argument gives the impression that his main emphasis is the placement upon him of a burden of proving that mitigating factors are sufficient to preclude imposition of the death penalty. However, the *substance* of this portion of his brief is that the Illinois death penalty statute, unlike others considered by the United States Supreme Court, precludes meaningful consideration of mitigating evidence and thus mandates imposition of the death penalty. We disagree.

Defendant specifically argues, first, that the requirement under the Illinois death penalty statute that mitigation preclude, *i.e.*, make impossible, a sentence of death is uniquely restrictive and violative of *Lockett v. Ohio* (1978), 438 U.S. 586, 57 L. Ed. 2d 973, 98 S. Ct. 2954. We do not find *Lockett* of any assistance to defendant.

In *Lockett*, the Supreme Court invalidated a statute which required the imposition of the death penalty unless the sentencing judge found one of four 'statutorily enumerated mitigating circumstances. In doing so, the Court held that the limited range of mitigating circumstances which could be considered by the sentencer under the Ohio statute was incompatible with the eighth and fourteenth amendments and that, to meet constitutional requirements, a death penalty statute must not preclude consideration of any aspect of a defendant's character or record and any circumstances of the offense which the defendant proffers as a basis for a lesser sentence. 438 U.S. at 604, 608, 57 L. Ed. 2d at 990, 992, 98 S. Ct. at 2964-65, 2967.

In accordance with *Lockett*, the Illinois death penalty statute allows the consideration of any mitigating factors relevant to the imposition of the death penalty, including, but not limited to, five specifically enumerated factors. (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(c).) Thus, any argument that Illinois' death penalty statute does not permit meaningful consideration of mitigating factors in the determination of whether to impose the death penalty based upon *Lockett* is clearly without merit.

Defendant next asserts that the Illinois death penalty procedure is arbitrary and capricious and thus violative of *Furman v. Georgia* (1972), 408 U.S. 238, 33 L. Ed. 2d 346, 92 S. Ct. 2726. Specifically, defendant attacks the requirement that the sentencing authority first determine whether a defendant "may be" sentenced to death due to the existence of any one or more of 11 ag-

gravating factors specifically enumerated in the Illinois death penalty statute and then determines whether there are any mitigating factors sufficient to preclude the death penalty. This procedure is arbitrary and capricious, defendant reasons, because after finding that death is a possible sentence, only a judge or jury who refuses to follow the law will find that death is not a possible sentence.

Whatever the logical appeal of this argument, the fact is that the determination by the sentencing judge or jury of whether any mitigating factors preclude the imposition of the death penalty after that same sentencing authority found the defendant eligible therefor does not require it to ignore the law or otherwise engage in a futile or impossible exercise. This court has repeatedly held that, in this regard, the Illinois death penalty statute calls for a balancing process.

In *People v. Brownell* (1980), 79 Ill. 2d 508, the defendant argued that, in requiring that mitigating factors be "sufficient" to preclude a sentence of death, the Illinois death penalty statute was unconstitutionally vague in that it did not provide the trier of fact any guidance as to the weight to be given the aggravating versus the mitigating factors. In rejecting this argument, this court found *Gregg v. Georgia* (1976), 428 U.S. 153, 49 L. Ed. 2d 859, 96 S. Ct. 2909, dispositive. In *Gregg*, the United States Supreme Court, in upholding the Georgia death penalty statute, held that the consideration of aggravating factors, which had been proved beyond a reasonable doubt, and mitigating factors by the trier of fact in determining whether to impose the death penalty, while by necessity somewhat general, nonetheless, provided guidance to the sentencing authority and did not result in the capricious, freakish or arbitrary imposition of the death penalty. 428 U.S. at 193-95, 49 L. Ed. 2d at 886-87, 96 S. Ct. at 2935.

Similarly to *Gregg*, the *Brownell* court concluded that the Illinois death penalty statute required a balancing or weighing of the aggravating and mitigating factors and that the fact that the precise weight to be given each factor was not a matter of numerical calculation was not a constitutional infirmity. Rather, the court reasoned, the discretion exercised by the sentencing authority was controlled by clear and objective standards so as to produce nondiscriminatory application of the death penalty since the sentencing authority was given specific evidence to weigh, based upon the particular circumstances of the case. *Brownell*, 79 Ill. 2d at 534; see also *People v. Stewart* (1984), 105 Ill. 2d 22, 76-77.

In *People v. Bean* (1990), 137 Ill. 2d 65, the defendant argued that allowing a jury to consider the statutory aggravating factors it had found to exist beyond a reasonable doubt at the eligibility phase of the sentencing hearing in determining whether he should receive the death penalty artificially inflated those factors and weighted the scales improperly in favor of death. In rejecting this argument, this court noted its frequent holdings that the balancing of aggravating and mitigating factors provided for by the Illinois death penalty statute adequately limited and directed the discretion of sentencing authorities to satisfy constitutional demands and that the statute's failure to assign a precise weight to each aggravating or mitigating factor did not give sentencing authorities improperly broad discretion. 137 Ill. 2d at 119-20.

The arguments of the defendants in *Brownell*, *Stewart* and *Bean* are sufficiently similar to those of defendant here to be dispositive. Regardless of defendant's semantical interpretation of the Illinois death penalty statute, the fact is that sentencing authorities are legally required to weigh and are actually capable of weighing mitigating factors against aggravating factors and, as a result, of properly determining whether or not a defendant merits the

death penalty. The requirement that aggravating factors making the defendant eligible for the death penalty be found to exist, as a preliminary matter, beyond a reasonable doubt does not render impossible the effective weighing of any mitigating factors thereafter established by a preponderance of the evidence.

Defendant further asserts, citing *Mills v. Maryland* (1988), 486 U.S. 367, 100 L. Ed. 2d 384, 108 S. Ct. 1860, that the placing of the burden upon defendants of producing mitigating evidence and requiring that such evidence must be sufficient to preclude the death penalty prevents the sentencing authority from giving the mitigating evidence meaningful effect. We disagree.

*Mills* provides no support to defendant in this regard. In *Mills*, the instructions given to the jury could be interpreted as requiring unanimous agreement that the same mitigating factor or factors *existed* in order to preclude imposition of the death penalty. No such interpretation could be ascribed to the Illinois death penalty statute.

Unlike the Maryland statute construed in *Mills*, the Illinois death penalty statute does not require the jury to reach unanimous agreement as to the *existence* of any mitigating factors before it can decide not to impose the death penalty. Rather, in Illinois, a sentencing jury is required to unanimously determine that mitigating factors sufficient to preclude the death penalty *do not exist* before that penalty can be imposed. In Illinois, unlike Maryland, the belief by one juror that any one mitigating factor sufficient to preclude the death penalty exists is sufficient to do so. As such, Illinois' death penalty procedure clearly provides for meaningful consideration of any and all mitigating factors.

For his last constitutionality argument, defendant, again like other defendants before him, urges us to consider whether aspects of the Illinois death penalty statute and procedure thereunder, the constitutionality of

which we have previously upheld on an individual basis, in their totality, render the statute unconstitutional. These aspects include: the State's discretion to decide to seek the death penalty *after* conviction and, thus, the lack of a requirement of pretrial notice to the defendant that it will do so; the requirement that mitigating factors must be "sufficient to preclude" the death penalty; the preclusion of the sentencing authority's consideration of the full range of sentencing options available; and the lack of notice or discovery of evidence to be used in aggravation. In the face of defendant's failure to address this court's prior holdings to such effect or to proffer any *compelling* reasons to reconsider those holdings, we continue to adhere to this court's holdings that the various aspects of the Illinois death penalty procedure, in their totality, as well as individually, do not render the imposition of the death penalty in Illinois arbitrary and capricious. *People v. Ramey* (1992), 151 Ill. 2d 498, 559; *People v. Gosier* (1991), 145 Ill. 2d 127, 165; *People v. Bean* (1990), 137 Ill. 2d 65, 141; *People v. Phillips* (1989), 127 Ill. 2d 499, 542-43.

For all of the reasons stated, defendant's conviction of the murder of Albert Oliver is affirmed, his death sentence is vacated and the cause is remanded for a new sentencing hearing consistent with the views expressed herein.

*Conviction affirmed;*
*death sentence vacated;*
*cause remanded.*

CHIEF JUSTICE MILLER, concurring in part and dissenting in part:

I join that portion of the majority opinion affirming the defendant's convictions. I do not agree with the majority, however, that the defendant was improperly found

eligible for the death penalty, and accordingly I dissent from that portion of the court's opinion.

The majority concludes that the trial judge erred in finding the defendant eligible for the death penalty under section 9—1(b)(3) of the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(3)). At the time relevant here, the "multiple murder" aggravating circumstance authorized imposition of the death penalty on a defendant convicted of multiple murders "regardless of whether the deaths occurred as the result of the same act or of several related or unrelated acts so long as the deaths were the result of either an intent to kill more than one person or of separate premeditated acts."

Two things are noteworthy about this language. First, the statute introduces the concept of premeditation, which is not otherwise a recognized mental state in Illinois. (*People v. Davis* (1983), 95 Ill. 2d 1, 33.) Second, when applied to a person convicted of murder under an accountability theory, the statute does not require that the accomplice have either of the specified mental states.

In the present case, the trial judge found the defendant guilty of the August 22, 1986, murder of Albert Oliver on the theory that the defendant knew that his acts were likely to result in death or great bodily harm. *Davis* had held in 1983 that a mental state of knowledge was sufficient to satisfy the requirements of section 9—1(b)(3). (*Davis*, 95 Ill. 2d at 36.) The judge's initial finding of guilt for the Oliver murder therefore would have been sufficient at the penalty stage to satisfy the premeditation requirement of section 9—1(b)(3). Because knowledge-based murders committed by a principal could render a defendant eligible under section 9—1(b)(3) at the time of the present offense, the defendant cannot complain that application of *Davis* to his case would be invalidly retroactive.

The second murder on which the State relied in establishing the defendant's eligibility for the death penalty under the multiple-murder aggravating circumstance of section 9—1(b)(3) was that of Derrick Wilkinson. (*People v. Ramey* (1992), 151 Ill. 2d 498.) The defendant and another person committed the Wilkinson murder on August 1, 1986. In that prosecution, a jury was instructed on all three forms of murder and, in addition, was instructed on the principles of accountability. The jury returned a general verdict finding the defendant guilty of the offense. Because the verdict was a general one, it did not specify the theory or theories on which the jury based its determination of guilt.

There are certain constitutional limits on the application of the death penalty to one who does not himself commit the acts causing the victim's death. In *Enmund v. Florida* (1982), 458 U.S. 782, 797, 73 L. Ed. 2d 1140, 1151, 102 S. Ct. 3368, 3376, the Supreme Court determined that the death penalty could not be imposed on a person convicted as an accomplice under a felony murder theory who "does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed." Later, in *Tison v. Arizona* (1987), 481 U.S. 137, 95 L. Ed. 2d 127, 107 S. Ct. 1676, the Court again considered the circumstances under which an accomplice may be sentenced to death. The *Tison* Court concluded that "major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the *Enmund* culpability requirement." *Tison*, 481 U.S. at 158, 95 L. Ed. 2d at 145, 107 S. Ct. at 1688.

*People v. Jimerson* (1989), 127 Ill. 2d 12, construed the same version of section 9—1(b)(3) that is involved in the present appeal. In *Jimerson*, this court concluded that the provision did not prohibit imposition of the death penalty on an accomplice guilty of multiple mur-

ders who acted with the requisite *Tison*-type culpability. In the present case, the trial judge relied on *Tison* and *Jimerson* in finding the defendant eligible for the death penalty under section 9—1(b)(3). The defendant now argues that the judge could not properly use those decisions because their application to this case would be invalidly retroactive, amounting to a denial of due process.

A limiting construction of statutory language may be applied retroactively to prior conduct if the litigant has been afforded fair warning. (*Dombrowski v. Pfister* (1965), 380 U.S. 479, 491 n.7, 14 L. Ed. 2d 22, 31 n.7, 85 S. Ct. 1116, 1123 n.7.) Contrary to the majority's view, I would conclude that application of the *Tison* principles to the defendant's participation in the Wilkinson murder was proper. As I have indicated, section 9—1(b)(3) may be applied to either principals or accomplices. In describing the circumstances under which the provision may be used, however, the version of the statute at issue here does not require that each guilty party have acted with either intent or premeditation. Rather, the statute simply requires that the acts causing the deaths have been performed with intent or premeditation by someone, without also mandating that the accomplice have possessed any particular mental state at all. *Tison*, however, prohibits imposition of the death penalty on a person convicted of murder under an accountability theory unless the person acted at least with reckless indifference. Accordingly, use of the *Tison* principles narrows rather than expands the reach of the present statute by limiting the group of offenders to whom it would potentially apply.

Thus, unlike *Bouie v. Columbia* (1964), 378 U.S. 347, 12 L. Ed. 2d 894, 84 S. Ct. 1697, on which the majority relies, the present case does not involve an unforeseeable judicial expansion or enlargement of narrow and precise statutory language. Rather, the potential scope of

section 9—1(b)(3) has only been limited, and the present defendant cannot complain if this new construction of the statute is applied in his case.

For the reasons stated, I respectfully dissent from that portion of the majority opinion finding error in the circuit court's determination that the defendant is eligible for the death penalty.