# Illinois Official Reports

## Appellate Court

---

### *People v. Prince*, 2021 IL App (3d) 190440

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. SHAQUILLE P. PRINCE, Defendant-Appellant. |
| District & No. | Third District<br>No. 3-19-0440 |
| Filed | September 24, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Will County, No. 18-CF-194; the Hon. Daniel L. Kennedy, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | James E. Chadd, Douglas R. Hoff, and S. Emily Hartman, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>James W. Glasgow, State's Attorney, of Joliet (Patrick Delfino, Thomas D. Arado, and Korin I. Navarro, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE DAUGHERITY delivered the judgment of the court, with opinion.<br>Presiding Justice McDade and Justice Lytton concurred in the judgment and opinion. |

**OPINION**

¶ 1 After a jury trial, defendant, Shaquille P. Prince, was convicted of obstructing justice (720 ILCS 5/31-4(a)(1), (b)(1) (West 2018)) and was sentenced to a period of conditional discharge and county jail time. Defendant appeals, arguing, among other things, that he was not proven guilty of the offense beyond a reasonable doubt.[1] We agree with defendant that the proof was insufficient. However, because the proof that was lacking pertained to an element of the offense that was added by an Illinois Supreme Court decision that was issued after the trial in this case, we reverse defendant's conviction and remand this case for a new trial rather than reverse defendant's conviction outright.

¶ 2 I. BACKGROUND

¶ 3 On January 25, 2018, defendant was arrested in Romeoville, Will County, Illinois, after an encounter with the police and charged with obstructing justice, a Class 4 felony. A bill of indictment was later filed. The indictment alleged that defendant had committed the offense by furnishing false information—a false name and date of birth—with the intent to prevent himself from being apprehended on an outstanding warrant.

¶ 4 Defendant's case proceeded to a jury trial in April 2019. The trial took two days to complete. Defendant was present in court for the trial and was represented by his appointed attorney. During the trial, the State presented the testimony of three witnesses. The first witness to testify for the State was Romeoville police officer, Francisco Garcia. Garcia testified that on January 25, 2018, shortly after 1 a.m., he was dispatched to a single-story home on Macon Avenue for a burglar alarm going off. Garcia arrived at the home the same time as Officer Jason Jandura.[2] The burglar alarm was no longer sounding at that time. Garcia and Jandura began checking the doors and windows of the home. They saw no sign of forced entry.

¶ 5 Garcia went around to the back of the home and saw that the rear sliding glass door was closed but unlocked. Garcia checked the door to see if it would open, and the burglar alarm went off again. Garcia closed the door, and a black male individual, who Garcia identified in court as defendant, came to the rear window. Defendant had nothing in his hands and was barefooted.

¶ 6 Garcia asked defendant if he lived at the residence, and defendant said, "no." Jandura came to the back of the home at that point because Garcia had told Jandura that there was a person inside. Garcia and Jandura asked defendant for his name, and defendant replied that he did not have to give them anything. The officers asked defendant for his identification, and defendant said that he did not have one. The officers explained to defendant that they were at the home because of the burglar alarm and that they only needed to identify defendant and make sure that defendant had permission to be at the home. The officers asked defendant if he owned the

_____

[1]Defendant also argues that the trial court erred by (1) failing to properly admonish the jury pursuant to Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) and (2) failing to conduct an inquiry into defendant's *pro se* posttrial claim of ineffective assistance of counsel. However, since the State has conceded that the proof of the offense was insufficient and we agree, we need not address the other two issues raised by defendant.

[2]Officer Jandura's first name was not provided in his testimony but was listed in the bill of indictment.

home, and defendant stated that he did not. Jandura asked defendant who lived at the home, and defendant stated, "Jessica." Jandura asked where Jessica was located, and defendant replied that she was five hours away. Defendant refused to call Jessica or to give Garcia Jessica's phone number. Defendant did, however, give Jessica's number to another officer at the scene.

¶ 7　　Garcia attempted to detain defendant with handcuffs until he could determine the status of the situation. As Garcia did so, defendant pulled back, went inside the residence, took a cell phone out of his pocket, and began recording the encounter. Defendant told the officers to get out of the house and started speaking into the phone. Garcia called for backup.

¶ 8　　Defendant told the officers that he was going back to sleep, but Garcia blocked defendant's path to the bedroom. After backup officers arrived and talked to defendant, the officers asked defendant for identification. Defendant attempted to walk past Garcia on two occasions and bumped into Garcia. Garcia would not let defendant pass and grabbed defendant's left hand. Defendant started to resist by tensing up his arms so the other officers assisted in detaining defendant.

¶ 9　　The second witness to testify for the State was Romeoville police officer Jason Jandura. Jandura's testimony, for the most part, was similar to that of Garcia. In addition to the information provided by Garcia, Jandura testified that after he arrived at the home, he went up to the front door and Garcia went around to the back. Jandura knocked on the front door and rang the doorbell several times, but no one answered. Garcia informed Jandura that the back of the home was unlocked so Jandura went around to the back. That was where the encounter with defendant occurred.

¶ 10　　During the encounter, after Jandura and Garcia had been speaking to defendant for a few minutes, they went into the home through the open door without being invited because they were investigating a crime. After the officers were inside, defendant still refused to give the officers his name. Jandura asked defendant multiple times to give the officers the homeowner's phone number or to contact the homeowner himself so that the officers could verify that defendant had permission to be at the home, but defendant refused. Instead, defendant pulled out his cell phone and began recording himself stating that he did not have to tell the officers anything and that he wanted the officers out of the home. After defendant bumped Garcia, the other officers grabbed defendant and took defendant to the floor.

¶ 11　　The entire encounter inside the home lasted about 10 to 15 minutes before the officers took defendant to the floor and placed defendant in handcuffs. According to Jandura, defendant was very agitated and uncooperative throughout the encounter. Defendant was yelling at the officers and telling the officers to get out and that he did not have to give the officers any information.

¶ 12　　Defendant was eventually taken to the police station. At the station, defendant refused to allow the officers to fingerprint or photograph him. Defendant complained that his wrists hurt and that he could not move them. The fire department was contacted to treat defendant, but defendant refused treatment and only requested ice.

¶ 13　　During the booking process, defendant told the officers that his name was "Sean Williams" and that his date of birth was June 7, 1989. The officers ran a computer check on that information but nothing came back. After speaking to a supervisor, defendant eventually allowed the officers to take his fingerprints and photograph. Jandura was not sure how long

defendant had been at the police station before that occurred but stated that "[i]t was more than minutes."

¶ 14     The State's third witness, Romeoville police officer James Myers, testified that he was one of the backup officers who responded to the home during the incident. The testimony of Myers was generally similar to that of Garcia and Jandura. In addition to the information that Garcia and Jandura provided, Myers testified that when he arrived at the home, Garcia and Jandura were in the back of the home in the kitchen with defendant. Defendant seemed agitated and was yelling—stating that he did not live at the home and that he did not have to tell the officers anything. Defendant tried to walk into the living room area, but Garcia was standing in the doorway. Garcia told defendant to step back. Defendant kept walking and used his arm to push Garcia. Defendant backed up slightly and then continued to move forward toward Garcia. As defendant and Garcia were standing chest to chest, Myers grabbed defendant by the arm and told defendant to put his hands behind his back and that he was under arrest.

¶ 15     While Myers and some of the other officers tried to place defendant under arrest, defendant was flaying his arms and trying to break free from Myers's grip. Myers delivered two knee strikes to defendant's leg. Defendant and the officers fell to the ground, and the officers were able to handcuff defendant.

¶ 16     After defendant was arrested, Myers stayed at the scene and spoke to the homeowner's friend, Amanda Reeves, who had voluntarily come to the home. Reeves told Myers the name of the homeowner and confirmed that the homeowner was out of town. Reeves stated that she knew defendant as "Sean" and indicated that she had social media pertaining to defendant. Reeves did not state at any point, however, that defendant was not allowed to be at the home.

¶ 17     Myers later returned to the police department. The officers were booking defendant at that time. Defendant told the officers that his name was "Sean Williams." The officers ran that name through the police computer, but no person with that name was found. Using the social media information that he had received from Reeves, Myers was able to infer that defendant's name was Shaquille Prince. Myers conducted an Internet search of that name and some of the cities in the area, and the first hit he received directed him to the Du Page County Sheriff's website. The suspect depicted in the sheriff's website appeared to be defendant—the same person that the Romeoville police had in custody. Myers learned that defendant had an active arrest warrant out of Du Page County that had been issued on January 8, 2018. A copy of that arrest warrant was identified by Myers during his testimony and was admitted into evidence without objection.

¶ 18     Myers testified further that later in the morning on January 25, 2018, at about 5 a.m., he was able to make contact with the owner of the Macon Avenue home. By that time, however, the officers had already determined defendant's real name and date of birth.

¶ 19     After the State rested, defendant testified in his own behalf. Defendant indicated that he met Jessica Dickinson, the owner of the Macon Avenue home, on a dating app while he was using the name, "Sean Williams." Defendant did not use his real name on the app because he previously had a bad experience and had some "stalkers" from the app come to his home.

¶ 20     On January 24, 2018, the day before the police encounter in the present case, defendant had spent the day with Dickinson at her home. By that time, defendant and Dickinson had known each other for a few months, had been dating, and had a great relationship. At about 9 p.m., Dickinson left with her parents to go to her parents' home in Louisiana.

¶ 21    Defendant was staying the night at Dickinson's home. At about midnight, defendant left and went to the gym. Defendant returned at about 1 a.m. and opened the door with the key that Dickinson had given him. As defendant did so, the burglar alarm went off. Defendant texted and called Dickinson to turn off the alarm remotely. The alarm stopped two minutes later, and defendant assumed that Dickinson had turned off the alarm.

¶ 22    Defendant washed up, ate, and went to bed. As defendant was sleeping, he awoke to a flashlight shining through the bedroom window. Defendant grabbed his cell phone because he was not sure what was happening and got someone to be on the cell phone with him. The burglar alarm sounded again. As defendant left the bedroom, he could see that the front door was closed and that none of the windows were altered. Defendant went to the kitchen where the sliding glass door to the back of the home was located and saw that there were police officers in the backyard.

¶ 23    Defendant opened the sliding glass door to the officers. Defendant was wearing underwear, a tank top, and a bonnet in his hair at the time. As soon as defendant opened the door, Garcia called for backup. The officers asked defendant his name, and defendant told the officers that his name was Shaquille Prince. Jandura took out a notepad and wrote down defendant's name. Garcia told defendant that he did not believe that defendant lived at the home and asked defendant if he had any identification. Defendant told Garcia that he had identification in his wallet and that he would go and get it. Garcia directed defendant to stay where he was at until the police had figured out the situation. Defendant complied.

¶ 24    In response to additional questions from the police, defendant provided the officers with the name, address, and phone number of the homeowner (Dickinson). Even though defendant had done so, the officers proceeded to enter the home. The officers were saying things, "egging [defendant] on," and trying to get defendant to react. Defendant did not react, did not stop the officers from coming into the home, and did not tell the officers to leave, although he did tell the officers that he did not want them to be at the home.

¶ 25    Defendant testified further that he was initially cooperative with the police and had told the police he had been living at the Macon Avenue home for a few months and had some of his belongings at the home. Defendant started recording the officers on his phone. About four or five additional officers came into the home, and defendant told the officers he would not provide any further information after he gave the officers his name. According to defendant, the officers were making jokes about whether defendant lived in the home and about defendant's last name.

¶ 26    At one point, one of the officers who was present at the scene but who did not testify at defendant's trial grabbed defendant's neck and choked him. The other officers started yelling at defendant to stop resisting and then violently took defendant down to the floor. Defendant was handcuffed on the floor with an officer's knee in his back and an officer's boot on his head. After handcuffing defendant, the officers searched the entire home and found defendant's wallet with defendant's identification inside.

¶ 27    During his testimony, defendant denied that he had resisted the officers, that he had tried to push past any of the officers, or that he had told the officers that he was going back to sleep. Defendant acknowledged during his testimony that his name was Shaquille Prince and that his date of birth was March 6, 1995, and denied that he had told the police his name was Sean Williams and that his birthdate was June 7, 1989.

¶ 28    Defendant also testified that he did not know on January 25, 2018, that there was a warrant out for his arrest. The warrant had been issued for an alleged failure to appear in court on a retail theft case in Du Page County that had been pending since 2016. Defendant knew that as part of that case, he had to appear for his court dates but denied that he had failed to appear for a court date in that case shortly before his arrest in the current case. Defendant ultimately resolved that case with a conviction for retail theft.

¶ 29    Upon the completion of defendant's testimony, the attorneys gave their closing arguments, the trial court instructed the jury on the law, and the jury started its deliberations. After deliberating for a little over an hour, the jury informed the trial court that it was unable to reach a verdict. The trial court gave the jury a *Prim* instruction (see *People v. Prim*, 53 Ill. 2d 62, 75-77 (1972)) and told the jury to continue its deliberations. The jury deliberated further and found defendant guilty of obstructing justice.

¶ 30    Following the jury's verdict, posttrial motions were filed by both defendant *pro se* and by defense counsel. Attached to defendant's motion were various documents from the court in Du Page County, which tended to indicate that the outstanding warrant for defendant's arrest had been issued in error and was subsequently vacated. Those documents were not presented as evidence in defendant's jury trial. Defendant requested to discharge his attorney and to be allowed to represent himself. The trial court eventually granted that request. After hearings were later held, the trial court denied defendant's motion for new trial and sentenced defendant to a period of conditional discharge and county jail time.

¶ 31    Defendant appealed. On appeal, defendant submitted in the appendix to his brief a court order dated June 2019 from defendant's Du Page County retail theft case. The court order stated, among other things, that the previous outstanding warrant for defendant's arrest had been issued in error. Defendant asked this court to take judicial notice of that court order in this appeal.

¶ 32                                    II. ANALYSIS

¶ 33    On appeal, defendant argues that he was not proven guilty beyond a reasonable doubt of obstructing justice. Defendant asserts that the State failed to prove the second and third elements of the offense—that defendant gave the false information to the police with the intent to prevent himself from being apprehended on the outstanding warrant and that defendant materially impeded the administration of justice by giving the false information. More specifically, as to the second element of the offense, defendant asserts that the State failed to prove that defendant even knew about the outstanding warrant, let alone that defendant acted with the intent to prevent himself from being apprehended on that warrant. In making that assertion, defendant points out that the warrant was later vacated after it was determined that it had been issued in error. Defendant also suggests that rather than intending to prevent his own apprehension on the outstanding warrant, it was entirely possible that he told the police his name was Sean Williams because he did not want his girlfriend (Dickinson) to find out his real name or because he wanted his girlfriend to know who the police were talking about since he had told his girlfriend that his name was Sean Williams. As to the third element, the material impediment element, defendant asserts that the State failed to prove that element in this case as the evidence showed that defendant had already been arrested and was at the police station when he gave the false name to the police; that the police were quickly able to determine, without any delay, that defendant had given a false name; and that there was no risk that the

police would mistakenly release defendant before they learned his true identity since the police were holding defendant until they heard back from the homeowner. As further error in this case, defendant also points out that the jury was never instructed about the material impediment element. Based upon the alleged insufficiency of the evidence, defendant asks that we reverse outright his conviction of obstructing justice.

¶ 34  The State agrees with defendant that the proof of the third element (the material impediment element) was insufficient but argues that the appropriate remedy is to remand defendant's case for a new trial, rather than to reverse defendant's conviction outright. In support of that argument, the State asserts that (1) contrary to defendant's contention, the evidence presented at trial was sufficient to prove the second element of the offense (that defendant knew there was an outstanding warrant for his arrest and gave the police a false name to try to avoid being apprehended on that warrant) beyond a reasonable doubt and (2) the supreme court in *People v. Casler*, 2020 IL 125117, ¶ 69, the case that added the third element to the offense of obstructing justice by giving false information, remanded the case for a new trial, rather than reversing defendant's conviction outright, where, as in the present case, the defendant's jury had not been instructed on the third element. For those reasons, the State asks that we reverse defendant's conviction of obstructing justice and that we remand this case for a new trial.

¶ 35  Defendant replies that a new trial is not warranted here because unlike in *Casler*, this is not a case where evidence of material impediment was excluded by the trial court. See *id.* ¶¶ 62-64. To the contrary, defendant maintains, in this case, the evidence that the State presented showed that there was no material impediment. Defendant again asks, therefore, that we reverse outright his conviction of obstructing justice.

¶ 36  When faced with a challenge to the sufficiency of the evidence in a criminal case, the standard of review that the reviewing court applies is the *Collins* standard (*People v. Collins*, 106 Ill. 2d 237, 261 (1985))—the reviewing court must view the evidence in a light most favorable to the prosecution and determine whether any rational trier of fact could have found the elements of the crime proven beyond a reasonable doubt. *People v. Austin M.*, 2012 IL 111194, ¶ 107; *People v. Jackson*, 232 Ill. 2d 246, 280 (2009). In applying the *Collins* standard, the reviewing court must allow all reasonable inferences from the record in favor of the prosecution. *People v. Bush*, 214 Ill. 2d 318, 326 (2005). The reviewing court will not retry the defendant. *Austin M.*, 2012 IL 111194, ¶ 107. Determinations of witness credibility, the weight to be given testimony, and the reasonable inferences to be drawn from the evidence are responsibilities of the trier of fact, not the reviewing court. *People v. Jimerson*, 127 Ill. 2d 12, 43 (1989). Thus, the *Collins* standard of review fully recognizes that it is the trier of fact's responsibility to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. See *Jackson*, 232 Ill. 2d at 281. That same standard of review is applied by the reviewing court regardless of whether the evidence is direct or circumstantial, or whether defendant received a bench or a jury trial, and circumstantial evidence meeting that standard is sufficient to sustain a criminal conviction. *Id.*; *People v. Kotlarz*, 193 Ill. 2d 272, 298 (2000). When applying the *Collins* standard, a reviewing court will not reverse a conviction unless the evidence is so improbable, unsatisfactory, or inconclusive that it leaves a reasonable doubt of the defendant's guilt. *Austin M.*, 2012 IL 111194, ¶ 107.

¶ 37    To prevail on a charge of obstructing justice by giving false information as alleged in the instant case, the State must prove the following three elements beyond a reasonable doubt: (1) that the defendant knowingly furnished false information (in this case, a false name and date of birth); (2) that the defendant did so with the intent to prevent the apprehension of any person (in this case, defendant himself on the outstanding warrant); and (3) that the false information materially impeded the administration of justice. See 720 ILCS 5/31-4(a)(1) (West 2018); *Casler*, 2020 IL 125117, ¶ 69. As the State's argument here indicates, the third element (material impediment) was only just recently made, or confirmed as, a required element of the offense under the law when the supreme court issued its decision in *Casler* in October 2020 and interpreted the obstructing justice statute to include a material impediment element when a person commits the offense by furnishing false information to the police. See *Casler*, 2020 IL 125117, ¶ 69.

¶ 38    With regard to whether the remaining elements of the offense were sufficiently proven in this case, it is clear from the statute and the case law that the State must do more than merely show that the defendant gave false information to the police to prove that the offense was committed. See 720 ILCS 5/31-4(a)(1) (West 2018); *People v. Gray*, 146 Ill. App. 3d 714, 717 (1986). The State must also show that the defendant possessed the requisite intent when the false information was provided (that the defendant gave the false information with the intent to prevent the apprehension of any person). See 720 ILCS 5/31-4(a)(1) (West 2018); *Gray*, 146 Ill. App. 3d at 717. The defendant's intent need not be proven by direct evidence and may be inferred from the surrounding circumstances. *Gray*, 146 Ill. App. 3d at 717. Furthermore, the determination of whether obstructing justice has been committed is not dependent upon the outcome of the prosecution alleged to have been obstructed. *Id.* at 716.

¶ 39    In the present case, when we review the evidence presented at defendant's jury trial in the light most favorable to the prosecution, we find that the evidence was sufficient to establish the first two elements of the offense but not the third element. With regard to the first element, Jandura and Myers both testified that defendant gave a false name at the police station. Jandura also testified that defendant gave a false date of birth. Although defendant testified to the contrary, it was for the jury as the trier of fact to assess the credibility of the witnesses and to determine which version of the facts to believe. See *Jimerson*, 127 Ill. 2d at 43. Taken in the light most favorable to the State, the evidence on the first element was not so improbable, unsatisfactory, or inconclusive that it leaves a reasonable doubt of the defendant's guilt. See *Austin M.*, 2012 IL 111194, ¶ 107. Indeed, defendant does not challenge the sufficiency of the evidence as to the first element here.

¶ 40    Turning to the second element of the offense, the evidence presented at defendant's jury trial established that a warrant for defendant's arrest had been issued in Du Page County on January 8, 2018, more than two weeks before defendant's encounter with the police in the present case. Defendant knew that he had a court case in Du Page County and knew that he had to appear in court for his court dates in that case. During the instant encounter, according to the police officers that testified, defendant was highly agitated and uncooperative. Even though defendant had heard the sounding of the burglar alarm and the police officers had explained to defendant their purpose for being at the home, defendant refused to provide police with his name or the name of the homeowner and refused to contact the homeowner or to allow the police to contact the homeowner so that defendant's permission to be at the home could be verified. After being taken to the police station, defendant persisted in his refusal to provide

information and also refused to allow the officers to photograph or fingerprint him. When defendant finally decided to furnish the information, he allegedly provided a false name and a false birthdate to the officers. It was the jury's role as the trier of fact to consider the timing of when the arrest warrant was issued and the level of defendant's alleged agitation and uncooperative behavior in the present case and determine whether those facts created a reasonable inference that defendant was aware that a warrant had been issued for his arrest and that he had given the police a false name and date of birth to try to avoid his apprehension on that warrant. See *Jimerson*, 127 Ill. 2d at 43; *Gray*, 146 Ill. App. 3d at 717. Although defendant testified at trial that he was not aware that a warrant had been issued, it was again for the jury as the trier of fact to determine whether to believe defendant's testimony in that regard (see *Jimerson*, 127 Ill. 2d at 43), and we cannot find that the evidence presented on the second element, when taken in the light most favorable to the State, was so improbable, unsatisfactory, or inconclusive that it leaves a reasonable doubt of the defendant's guilt (see *Austin M.*, 2012 IL 111194, ¶ 107). The documentation from Du Page County, which indicated that the outstanding warrant had been issued in error and was later vacated (or quashed and recalled), has no bearing on our conclusion in that regard since those documents were not presented as evidence to the jury in defendant's jury trial.

¶ 41 Finally, as for the third element, although we agree with the parties that sufficient proof was not presented, we recognize that the third element was not made a required element under the law until approximately 18 months after the trial in this case when the supreme court issued its decision in *Casler*. See *Casler*, 2020 IL 125117, ¶ 69. We, therefore, find that the appropriate remedy in this case, as in *Casler*, is to reverse defendant's conviction and to remand for a new trial. See *id.* ¶¶ 66-67 (recognizing that double jeopardy concerns did not prevent a retrial of the defendant when the evidence presented at the defendant's trial had been rendered insufficient by a posttrial change in the law and not by the State's failure to present sufficient evidence).

¶ 42                                        III. CONCLUSION

¶ 43 For the foregoing reasons, we reverse defendant's conviction of obstructing justice and remand this case for a new trial.

¶ 44 Reversed and remanded.